El Pueblo de Puerto Rico, demandante y apelado, *v.* Luis Arroyo, acusado y apelante.

No. 3409.—*Visto:* Marzo 28, 1928. *Resuelto:* Julio 12, 1928.

*Juan B. Soto* y *Carlos M. Pesquera,* abogados del apelante; *José E. Figueras,* abogado de *El Pueblo,* apelado.

EL JUEZ PRESIDENTE SEÑOR DEL TORO, emitió la opinión del tribunal.

M. Vega Riollano, Jefe de Distrito de la Policía Insular, presentó denuncia contra el apelante imputándole el siguiente hecho como ocurrido en Río Piedras el 10 de abril de 1926: "Luis Arroyo, allí y entonces, ilegal, voluntaria y maliciosamente y con la intención criminal de causarle daño corporal a la joven María Olivar, le acometió y agredió con las manos, agarrándola fuerte y violentamente por los brazos sosteniendo una lucha con dicha joven." Especificó como circunstancia agravante la de ser el agresor un varón adulto y la agredida una mujer.

Celebrado el juicio, la corte de distrito condenó al acusado como autor de un delito de acometimiento y agresión grave y le impuso la pena de un año de cárcel. No conforme Arroyo apeló para ante este tribunal señalando en su alegato la comisión de tres errores.

Por el segundo señalamiento se sostiene que la corte erró al permitir la declaración de la perjudicada por medio de un intérprete.

La perjudicada era sordomuda. Se trató de que declarara por medio de su madre que fué una testigo en el juicio. La defensa se opuso y la corte suspendió la vista dando al fiscal la oportunidad de buscar un perito. Llamada de nuevo la causa, el fiscal presentó como perito a Eduardo Pons, Segundo Jefe de la New York and Porto Rico Steamship Company que tiene cuatro hermanos sordomudos y con ellos se comunica por señas y por letras y que ha servido en varias ocasiones ante las cortes como intérprete en casos de sordomudos. A nuestro juicio quedó establecida perfectamente la capacidad.

Se impugna el uso del intérprete porque éste dijo al principio que no podía entenderse con la perjudicada. Es cierto, pero también lo es que, como se deduce de sus manifestaciones, no había logrado aún ganarse la confianza de la perjudicada y ésta al parecer rehusaba comunicarse. Pasó algún tiempo y la traducción de las señas a palabras y conceptos fué tan clara y precisa y a la vez tan peculiar que no hay duda alguna que fué la sordomuda la que habló por medio del testigo.

Dice Cyc. resumiendo la jurisprudencia:

"Un sordomudo puede ser interrogado por medio de preguntas escritas, las cuales él puede contestar también por escrito, o valiéndose de un intérprete que se comunique con él por medio de signos, descansando generalmente la forma del interrogatorio en la sana discreción de la corte sentenciadora." 40 Cyc. 2413.

Y antes había dicho:

"Antiguamente la ley clasificaba a los sordomudos como idiotas y los consideraba incapaces de servir como testigos; pero la regla moderna es que el hecho de que una persona adolezca de estos defectos no le hace incapaz, cuando esa persona tiene suficiente capacidad mental para observar con certeza las cuestiones respecto de las cuales tiene que declarar y de apreciar la·fe del juramento, y puede relatar los hechos valiéndose de un método que su defecto físico le permite; sin embargo, no es propio admitir la declaración de un sordomudo que nunca ha recibido la educación adecuada para tales personas y que no puede darse cuenta de la responsabilidad que contrae al prestar juramento, o de las preguntas que se le hacen." 40 Cyc. 2202.

En esta causa no surgió cuestión alguna con respecto a la capacidad mental de la sordomuda declarante.

Los errores primero y tercero pueden examinarse conjuntamente. Se alega que la prueba es insuficiente o que en todo caso sería suficiente para demostrar la existencia de otro delito pero en modo alguno la de aquel por el que fué acusado y condenado el apelante.

Conocemos la denuncia. Examinemos la prueba.

María Olivar, la perjudicada, dijo: que este hombre—refiriéndose al acusado— es malo; que la cogió por las manos, el pelo, la dobló, la besó en la nuca y que ella ·gritó 'Mamá . . . Mamá' y entonces vino su mamá; que le rasgó el traje y con las uñas la rasgó en el brazo. . . Que ella lo rechazaba. . . Que no quería. . . Que ella gritaba: quita, quita . . . Mamá.''

Maximina Díaz de Olivar, madre de María, dijo que vivía en Hato Rey, Parada 37, Río Piedras, que salió de su casa dejando en ella planchando unas camisas de su hermano a su hija, que volvió a los diez minutos y al entrar vió al acusado que tenía a su hija ''cogida por el cuello, con los pantalones desabotonados y con ella empuñada tratando de retenerla en la falda y ella tratando de zafársele, luchando los dos.'' Que abrió la ventana y llamó a los vecinos. Que su hija es sordomuda, pudiendo pronunciar sólo algunas palabras.

Juana Zoila Rodríguez, una vecina que se quedó en la puerta de la casa cuando la Sra. Díaz entró, dijo, entre otras cosas, que vió que ''él (el acusado) la tenía cogida a ella (la perjudicada) y ella estaba haciendo fuerzas para atrás como tratando de zafársele, y él estaba halándola como para sentarla en la falda.''

Domingo Castillo declaró en resumen que vió entrar a la casa a doña Maximina y a la testigo Rodríguez y al momento oyó que dijo la señora: ''Miren que hombre más atrevido, sinvergüenza y descarado!'' Que en seguida salió de la casa corriendo el acusado abotonándose los pantalones y se metió en la suya que estaba cerca.

Más o menos declara lo mismo el otro testigo Norberto Jiménez. El policía denunciante, manifestó que no tenía conocimiento personal directo de los hechos. Por certificación del acta de su nacimiento se demostró que el acusado tenía treinta y cinco años cumplidos.

Estamos conformes en que esa prueba demuestra algo más que un acometimiento y agresión a una mujer por

parte de un varón adulto, pero no en que deje de ser suficiente para condenar al acusado como autor de tal delito.

Todo acto ilegal de inferir algún daño violento en la persona de algún semejante con la intención de causarle daño cualquiera que sean los medios o el grado de violencia que se emplearen, constituirá un delito de acometimiento y agresión, dice la sección primera de la ley para determinar y castigar el acometimiento, etc., aprobada el 10 de marzo de 1904, Comp. 1911, p. 948. Y aquí cualesquiera que fueran los ulteriores propósitos criminales del acusado, es evidente que acometió y agredió a un semejante con la intención de causarle daño.

Hay un precepto en el Código de Enjuiciamiento Criminal que dice: ''Art. 286. El jurado podrá declarar al acusado culpable de la comisión de cualquier delito, necesariamente comprendido en el delito imputádole, o de tentativa de cometerlo.'' Y la verdad es que en el delito de violación cometido por fuerza o violencia, y aún quizá en cualquiera otra de sus formas, está comprendido el de acometimiento y agresión.

El caso no es nuevo en la práctica ni en la jurisprudencia. Entre las diferentes clases de acometimiento existen aquellos que se designan como *inmorales o indecentes* (*indecent assaults*). Refiriéndose a ellos dice Ruling Case Law:

''Un acometimiento inmoral tiene muchos de los elementos de un acometimiento con la intención de realizar violación, pero no llega hasta éste por no haber la intención de cometer el delito más grave. Un acometimiento inmoral consiste en el hecho de que un varón se tome libertades inmorales con la persona de una mujer de manera lujuriosa y lasciva, sin su consentimiento y contra su voluntad, y sin la intención de cometer el delito de violación.''

Sigue el autor tratando extensamente la materia. Ninguna de las defensas que pudieran alegarse concurre en este caso. De la prueba no sólo surge evidente el acto del acusado, sino la resistencia de la pobre sordomuda.

*Debe confirmarse la sentencia recurrida.*