EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* IGNACIO FLORES, acusado y apelante.

No. 4952.—*Sometido:* Junio 14, 1933. *Resuelto:* Julio 19, 1933.

*Felipe Colón Díaz,* abogado del apelante; *R. A. Gómez, Fiscal,* abogado de El Pueblo, apelado.

EL JUEZ ASOCIADO SEÑOR CÓRDOVA DÁVILA, emitió la opinión del tribunal.

Ignacio Flores, declarado culpable por un jurado de un

delito de violación en la persona de María Leonarda Figueroa, fué condenado por la Corte de Distrito de Ponce a la pena de cinco años de presidio. No conforme el acusado con esta sentencia interpuso el presente recurso de apelación. Se alega que la corte *a quo* erró "al permitir, con la oposición de la defensa, que la declaración de la presunta perjudicada María Leonarda Figueroa, quien es una analfabeta y en el momento de empezar el juicio informó el fiscal es una sordomuda, fuese trasmitida al jurado por mediación del intérprete Juan José Figueroa, quien es un analfabeta y hermano de la perjudicada, y quien no tenía la preparación necesaria para servir como tal intérprete."

■■ Dos son las razones que sirven de base a la defensa para juzgar errónea la admisión del intérprete Juan José Figueroa: el analfabetismo de dicho intérprete y el de su hermana y el parentesco que media entre ambos. No se querella la defensa de que se haya admitido el testimonio de María Leonarda Figueroa, sino de que este testimonio haya sido trasmitido por un intérprete que es analfabeta y que no tiene la preparación necesaria para servir como tal intérprete.

El fiscal anunció primeramente que la supuesta perjudicada era sordomuda y se hacía necesario obtener su declaración mediante un intérprete, luego de haber sido éste examinado con respecto a su capacidad y competencia para interpretar a la referida sordomuda. Compareció ante la corte la testigo. Fué examinada por el fiscal y por el juez y contestó las preguntas que se le hicieron con sonidos guturales y señales con los dedos, sin pronunciar palabra alguna. La defensa declinó interrogarla, insistiendo que no se había probado que era sordomuda. La corte resolvió admitir el testimonio. Se procedió entonces a examinar al intérprete para determinar su capacidad como tal. Se le sometió a un interrogatorio bastante amplio y declaró que María Leonarda Figueroa es su hermana menor, que vivieron juntos desde que nació, que dicha hermana nació sordomuda y que siempre

se ha entendido y se entiende con ella por señas, que comprende todo lo que ella le dice y que nunca ha oído a su hermana pronunciar palabra inteligible.

La corte, después de examinado el testigo por el fiscal y la defensa, decidió admitirlo como intérprete, expresándose en los siguientes términos: "La corte cree que se ha capacitado al testigo Juan José Figueroa para servir de intérprete a María Leonarda Figueroa, por ser ésta una sordomuda, de acuerdo con lo resuelto en el caso de *El Pueblo* v. *Arroyo,* 38 D.P.R. 530, en que el fiscal quiso traer precisamente a la madre y la defensa se opuso. Entonces se trajo a un perito y ese perito se cualificó por el hecho de que tiene cuatro hermanos sordomudos y con ellos se comunica por señas. De manera que en cuanto a la capacidad, la corte cree que está capacitado el testigo." La defensa tomó excepción a la resolución de la corte. No creemos que el analfabetismo de José Figueroa sea razón suficiente para incapacitarlo como intérprete de la sordomuda si realmente está acostumbrado a comunicarse con ella por señas y puede entender lo que le dice. En el caso de *People* v. *McGee,* 1 Denio (N. Y.) 19, se resolvió que no es necesario que el sordomudo sepa leer y escribir. Tampoco debe ser necesario que el intérprete reúna estas condiciones. Lo esencial es que esté acostumbrado a comunicarse con el sordomudo mediante preguntas y respuestas formuladas por señas mutuamente comprendidas por uno y otro. En el citado caso de *People* v. *McGee,* se trataba de una sordomuda de entendimiento reducido, pero se demostró que podía hacer señas y que tenía entendimiento bastante para protegerse a sí misma y comunicar sus deseos, y observar cosas de las cuales informaba al intérprete por señas que éste podía comprender, y que no tenía dificultad en sostener una conversación ordinaria. La corte sostuvo que no había objeción a su competencia como testigo para producir su testimonio a través de un intérprete por señas, aunque la sordomuda no podía hablar ni escribir. En dicho caso el testigo que actuó como intérprete tenía un conoci-

miento previo del entendimiento y capacidad de la persona cuya evidencia fué llamado a trasmitir.

La capacidad del intérprete puede demostrarse, a nuestro juicio, en un caso como el presente en que la sordomuda es analfabeta, mediante prueba de que está acostumbrado a comunicarse con el sordomudo por señas, que se hace entender del mismo y que entiende e interpreta fielmente el significado de sus señas. En el caso de *Bugg* v. *Houlka,* 9 A. L. R. 480, resuelto por la Corte Suprema de Mississippi, declaró un testigo sordomudo por medio de un intérprete. En este caso dijo la corte:

"Opinamos que no hay mérito en el argumento de que el intérprete era incompetente. Se ha sostenido que el intérprete de un sordomudo no necesita ser perito si puede entender suficientemente las señas usualmente empleadas por el testigo sordomudo y puede interpretar fiel y verdaderamente su significado."

■ Arguye el apelante que Juan José Figueroa, por el hecho de ser hermano de la testigo, "tenía que tener un interés marcado en que la acusación del fiscal prosperase, siendo además una persona sin instrucción alguna que no estaba en condiciones de traducir las preguntas que los abogados defensores debían hacerle a la perjudicada." No creemos que el parentesco sea motivo de incapacidad para desempeñar las funciones de intérprete, cuando se trata de trasmitir el testimonio de un sordomudo. Los parientes, que han estado en constante asociación con el sordomudo y se han familiarizado con sus señas y las entienden y se hacen entender del mismo, pueden ser a veces las únicas personas accesibles para servir de intérprete y las más capacitadas para trasmitir su testimonio con fidelidad, sobre todo cuando se trata de un sordomudo que no sabe leer y escribir. El interés que un testigo pueda tener en un caso determinado no es en nuestros tiempos motivo de incapacidad. No hay duda alguna de que Juan José Figueroa, si hubiese presenciado los hechos imputados en la acusación, habría estado capacitado para declarar como testigo a pesar de ser her-

mano de la sordomuda. También debe estarlo para trasmitir su testimonio después de haber prestado un juramento de interpretarla con fidelidad.

■ El segundo error que se atribuye a la corte consiste en no haberse permitido a la defensa que preguntara a la testigo María Leonarda Figueroa si había tenido contacto carnal anteriormente con otros hombres. La pregunta formulada por la defensa dice así: "Que si ella, antes de esa noche había querido a otros hombres."

Arguye el apelante que tenía derecho a investigar la conducta de la perjudicada en el curso de las repreguntas. La corte no permitió a la defensa formular esta repregunta, reservándole el derecho de ofrecer esta defensa en el momento oportuno como prueba del acusado. Aun en la hipótesis de que esta pregunta fuese admisible, del modo como fué formulada, entendemos que la resolución de la corte no lesionó ningún derecho del referido acusado. La defensa, al anunciar la teoría de su caso, dijo que el acusado no era responsable de los hechos imputados por el fiscal, porque no los cometió, y el propio acusado, a preguntas de la defensa, manifestó que no realizó acto carnal alguno con su prima, que es la sordomuda, a quien respeta como familia. No puede querellarse el acusado de haber sido perjudicado por la no admisión de esta repregunta, desde el momento en que niega haber tenido acceso carnal con la sordomuda.

La Corte Suprema de Utah, en el caso de *State* v. *Scott*, 188 Pac. 864, se expresó en los siguientes términos, discutiendo una cuestión prácticamente igual a la planteada por la defensa en este caso:

"Se alega además que la corte erró al no permitir al acusado probar que la reputación general de la perjudicada con respecto a su castidad era mala. En otras palabras, que dicha perjudicada no estaba reputada como casta en la comunidad donde vivía. La defensa insistió que de acuerdo con las decisiones tal defensa estaba autorizada. En vista de que el acusado negó que estuviera con la perjudicada la noche en cuestión, y que hubiera tenido comercio car-

nal con ella entonces o en cualquier otro tiempo, nosotros no podemos concebir cómo tal evidencia pueda tener ninguna pertinencia en este caso, excepto tal vez para afectar la, credibilidad de la perjudicada. Sin embargo, no se ofreció la prueba para este fin y no se alega aquí que debió ser admitida para dicho propósito. Cuando el acusado admite el acto sexual, pero alega que la perjudicada consintió, y cuando como aquí ella ha llegado a la edad legal, tal evidencia es pertinente sobre la cuestión del consentimiento. Si bien es cierto que aun una prostituta puede negarse a consentir al acto carnal, sin embargo, de acuerdo con la ley, una mujer deshonesta es mucho más accesible al consentimiento que una mujer casta, y por lo tanto, evidencia de que la perjudicada estaba generalmente reputada como no casta, es pertinente para el propósito mencionado.''

Copia la Corte Suprema de Utah un párrafo de la opinión emitida por la Corte Suprema de Florida en el caso de *Rice* v. *State of Florida,* 35 Fla. 236, 17 So. 286, que dice así:

''Considerando la línea de defensa adoptada por el acusado, ningún perjuicio puede habérsele ocasionado mediante la exclusión de este testimonio. El único propósito para el cual tal testimonio fué ofrecido era demostrar una probabilidad de consentimiento por parte de la perjudicada al acto del acusado. La defensa no se basó sobre una teoría de consentimiento al acto, sino sobre una negativa por el acusado de que él hubiese tenido comercio carnal con la muchacha. Por lo tanto, el testimonio era completamente impertinente y no pudo tener ninguna referencia a la defensa hecha por el acusado.''

Véanse también los casos de *Jordan* v. *State,* 165 Ark. 502, 265 S. W. 71; y *Nickels* v. *State,* 90 Fla. 659, 106 So. 489.

En el presente caso, según se deduce de las manifestaciones de la defensa, la prueba fué ofrecida única y exclusivamente con el propósito de demostrar la probabilidad del consentimiento de la perjudicada. Al oponerse el fiscal a la repregunta de la defensa, ésta hizo constar que se estaba investigando un caso de violación por fuerza y violencia y que era pertinente saber si la perjudicada se había querido con otros hombres. Tampoco tuvo éxito la defensa con la prueba que ofreció sobre la conducta de María Leonarda Figueroa. Wenceslao Colón, testigo de la defensa, declaró que hace diez

años tuvo un hijo en la sordomuda. Se le preguntó sobre el concepto general de la misma, y contestó: "Lo que yo sé nada más. Después de ese caso conmigo, no se había nombrado; ha sido una mujer que estaba en su casa."

El testigo Ernesto Ortiz declara que hacía como 3 ó 4 años que conocía a María Leonarda Figueroa, que no ha visto que se haya querido con otros hombres, aunque ha sabido algo por referencia. Cuando se le pregunta si conoce la reputación de que goza en la comunidad María Leonarda Figueroa, responde que la ignora. Esta es toda la prueba ofrecida por la defensa sobre la conducta moral de la sordomuda. Como ya dijimos antes, la corte en su resolución no lesionó ningún derecho del acusado, desde el momento en que éste niega rotundamente que haya tenido comercio carnal con la perjudicada. Se desestima este supuesto error.

■ Se alega además que la Corte de Distrito de Ponce cometió error al dar sus instrucciones al jurado en la forma en que lo hizo, perjudicando así los derechos substanciales del acusado. En su alegato, la defensa llama la atención al párrafo segundo de las instrucciones de la corte al jurado, que dice así:

"Y como primera providencia, permítanme los señores del jurado que les diga que ni el informe del abogado defensor ni el informe del fiscal pueden considerarlos los señores del jurado como prueba en el caso; es decir, no vais a resolver este caso por lo que haya dicho el fiscal ni por lo que haya dicho el abogado defensor, sino única y exclusivamente por lo que han declarado aquí los testigos en el día de hoy."

Es claro que los informes del fiscal y la defensa no constituyen evidencia en el caso. Asumimos, porque así se desprende a nuestro juicio del texto del párrafo que acabamos de copiar, que al decir la corte al jurado que no iba a resolver el caso por lo que haya dicho el fiscal ni por lo que haya dicho el abogado defensor, sino única y exclusivamente por lo que han declarado los testigos, quiso reiterar su manifestación de que lo dicho por ambas partes no constituye prueba.

No parece que la corte se refiriera a los argumentos que se ofrecieron por las partes en defensa de sus respectivas posiciones. No es propio que la corte, al instruir al jurado, haga manifestaciones tendentes a desacreditar los argumentos que se aduzcan dentro de los límites de la ley y de los hechos del caso. Las partes tienen el derecho de ser oídas a través de sus abogados, y a presentar sus argumentos con la debida amplitud, y es deber de la corte garantizar y proteger el ejercicio de este derecho reconocido por la ley. Aunque, como ya hemos dicho, las palabras de la corte no tienen el alcance que le atribuye la defensa, sin embargo, hubiese sido preferible que se hubiese omitido por lo menos la última parte de la instrucción objetada.

█ Alega el acusado que la instrucción dada por la corte en el sentido de que es bastante que la prueba de corroboración tienda a demostrar algunos detalles que establezcan la relación entre el acusado y el delito, no está autorizada por la ley. El informe de la corte al jurado en cuanto a la corroboración, dice así:

"De acuerdo con la ley, en casos de violación, el acusado no puede ser declarado culpable con la sola declaración o testimonio de la mujer agraviada, a menos que su declaración se corroborase con alguna otra prueba. No es necesario, sin embargo, que la prueba de corroboración comprenda o muestre por sí misma todos los elementos del delito, sino que es bastante si ella tiende a mostrar algunos detalles que establezcan una relación entre el acusado y el delito.

" *      *      *      *      *      *      *

"Antes de entrar en esas instrucciones generales, era mi intención insistir algo más en la cuestión de la corroboración, en que se insistió mucho por las partes, pero que tampoco pueden obedecerlas los señores del jurado. Ningún hombre puede ser declarado culpable en Puerto Rico de un delito de violación por la sola declaración de la mujer. Vosotros que sois hombres os daréis cuenta del peligro que eso sería: una mujer no tendría más que decir, 'Fulano de Tal me violó,' y si la declaración de ella nada más fuera suficiente, ya sabríais la injusticia que se podría cometer. Por eso la ley prevé, y sabiamente exige que esa declaración sea corroborada.

por alguna prueba. ¿Qué prueba es ésa? Ya os lo dije anterior-mente.

"El delito de violación, como todos los delitos, cuando se va a cometer, no se comete delante de testigos. El que va a cometer un delito por lo general busca cometerlo donde nadie lo vea. Por tanto, se requiere la corroboración en esta clase de delitos, además de otra prueba. Y no es necesario que esa prueba sea de tal naturaleza que se corroboren todos los extremos de la violación en sí; eso no lo requiere la ley. Lo único que se requiere es prueba de detalles que lleven a la mente de los señores del jurado la conexión, la relación que haya podido tener el acusado con el delito."

Opinamos que es innecesario discutir la cuestión planteada por la defensa, porque en este caso la prueba aportada, que el jurado creyó al dictar un veredicto de culpabilidad, reúne elementos bastantes de corroboración para sostener el referido veredicto. Declaró en primer término el perito médico, manifestando que había examinado los órganos genitales de María Leonarda Figueroa, encontrando que había un desgarre del himen con marcada equimosis de la labia minora y de los tejidos contiguos; equimosis en el bajo vientre y en el tercio superior de la pierna izquierda, región interna, con una secreción muco-purulenta y la horquilla baja, que son señales de coito. Certifica el facultativo que había señales de un coito reciente y de violencia corporal. La referida María Leonarda Figueroa había sido desflorada con ante-rioridad.

Declaró la perjudicada, por conducto del intérprete Juan José Figueroa, que el acusado a quien ella llama Tato, que era su primo hermano, la noche de autos la agarró por un brazo en compañía del viejo Emiliano, la llevó más abajo de la casa donde se celebraba un baile, le apretó la nariz, la cogió y la forzó y le tapó la boca, teniendo contacto carnal con ella.

Declararon también los testigos Eduvigis Ortiz, Germán Díaz y Andrés Corsino que habiendo desaparecido del baile la sordomuda María Leonarda Figueroa salieron a buscarla y encontraron que más abajo de la casa, cerca de un rancho,

estaba con ella el acusado Ignacio Flores con el viejo Emiliano y que al aproximarse a ellos con el fin de inquirir qué hacían allí, el acusado manifestó que no se arrimara nadie, porque peligraba la vida del que se arrimara. Andrés Corsino lo emplazó para la corte al siguiente día, contestando el acusado que no le tenía miedo ni a la corte ni a los jueces ni a nadie; que los testigos se retiraron y el acusado quedó con la sordomuda, sin que regresaran a la casa del baile en todo el resto de la noche hasta el amanecer en que regresó Ignacio Flores, el acusado, solo.

Germán Díaz declara que como a las dos de la mañana vió que el Sr. Emiliano Ortiz fué a la puerta del cuarto donde estaba María Leonarda, la cogio por un brazo y haciendo un simulacro como que estaba bailando con ella, se fueron a la puerta donde estaba el señor Ignacio Flores y que de allí se fueron los tres, yendo Leonarda apacible y andando por sus pies. El fiscal muestra al testigo una declaración anteriormente prestada, que el testigo reconoce y ratifica, según puede verse por las preguntas y respuestas que copiamos a continuación:

"¿Usted recuerda haber declarado ante el Juez Municipal Nogueras lo siguiente?: 'Se la entregó a Ignacio Flores, que estaba en la puerta del subir del baile. Ignacio entonces le echó el brazo a María Leonarda por encima y se la llevó a la fuerza porque ella no quería ir.' Vamos a ver cuál es la verdad, si esto que usted declaró en esta declaración ante el juez municipal, o lo que usted acaba de declarar, en los puntos en que no coinciden.

"Tormes: Muy sugestiva, señor juez. Por la forma de la pregunta nos oponemos.

"Juez: Con lugar la oposición.

"Explique la contradicción.

"Testigo: La contradicción que hay aquí es que yo en esta declaración que hay aquí me equivoqué; pero es verdad que él le echó el brazo.

"Fiscal: ¿Se la llevó a la fuerza?

"Colón: No, señor, me opongo.

"Tormes: Con nuestra oposición; muy sugestiva.

"Juez: La corte la admite.

"Fiscal: ¿Se la llevó a la fuerza?

"Tormes: Ésa es una conclusión.

"Fiscal: ¿Usted no lo declaró ahí?

"Test.—Después que la llevaron parte abajo de la casa, se la llevaron a la fuerza.

"Fiscal: ¿Don Emiliano se la entregó al acusado y el acusado se la llevó a la fuerza? ¿Eso fué así o no fué así?

"Tormes: Eso es muy, muy sugestivo.

"Test.—Después que se fueron los dos, que se fueron parte abajo de la casa, entonces sí iban a la fuerza. Ella, desde luego, cuando el señor Ignacio Flores se la llevaba, no me dí cuenta si iba llorando, o, que como no sabía la idea con que él se la llevaba . . . .

"F.—¿De manera que fué a la fuerza que la llevaba?

"Sí.

"Tormes: Nos seguimos oponiendo.

"Fiscal: Nada más.

"Juez: Repregunta . . .

"Tormes: ¿Usted escribió eso?

"Eso yo no lo escribí. Yo lo pronuncié por mi boca y otro lo escribió.

"Fiscal: Entonces presento esto.

"Tormes: Con nuestra oposición, señor juez.

"Juez: La corte no la admite porque él ha explicado aquí ya que por lo largo de la declaración se le olvidó eso.

"Tormes: ¿Usted vió la fuerza esa que hizo el acusado cuando se la entregó Emiliano?

"Testigo: Seguramente. Cuando iban para la parte abajo de la casa, pues le echó el brazo y se la llevó a la fuerza."

También declara Germán Díaz que él, Andrés Corsino y Eduvigis Ortiz, hijo este último de Emiliano Ortiz, quien según el testigo entregó la sordomuda al acusado, salieron a buscarla, yendo el testigo detrás, y que al encontrarlos, en un sitio donde hay un ranchito, don Andrés les dijo: "¿Para dónde van ustedes con esa mujer?", contestando Ignacio que el que se le acercara corría peligro, y que don Andrés dijo: "Pues la cosa está mala, vámonos que eso se arreglará en la corte"; que en el momento en que vió a Leonarda cerca de la casita, estaba gimiendo, como que quería llorar, que no estaba llorando, sino que le salía una cosa como que

quería llorar. Eduvigis Ortiz, hijo de Emiliano, declara que María Leonarda estaba tranquila, que no hacía movimiento.

Declaró también la testigo Narcisa Alicea, tía carnal del acusado, así como de la sordomuda, expresando que la noche del baile dicho acusado llevó la sordomuda a su casa, a casa de ella, y la dejó allí.

Como prueba de defensa, el acusado presentó cuatro récords criminales para demostrar que cuatro individuos habían sido acusados por el fiscal del distrito por violaciones cometidas esa misma noche con la perjudicada. Trató también de demostrar la mala reputación de que gozaba la sordomuda en la comunidad, sin que tuviera éxito en sus propósitos. Declaró por último el propio acusado, quien manifestó que la noche de autos sacó del baile a la sordomuda y la llevó a casa de su tía Narcisa para evitar abusos que dice se cometían con ella, negando que hubiese tenido contacto carnal con la misma. El fiscal le pregunta a qué atribuye el coraje y la indignación que la sordomuda demostró en la silla contra él y responde que al odio que le tiene la referida sordomuda. Copiamos a continuación lo que dice el acusado sobre este extremo, a preguntas del fiscal:

"Fiscal: ¿Usted oyó lo que declaró la muda aquí esta mañana?
"Testigo: Sí.
"Fiscal: ¿Usted la oyó decir, refiriéndose a usted, llamándole Tato?
"Eso es.
"¿Usted vió lo que ella declaró?
"Sí.
"¿Esta mañana? ¿Lo oyó?
"Lo oí.
"¿Qué hay con respecto a eso?
"Pero eso no es así como ella dice.
"¿Cómo usted sabe que no es así?
"Porque no, porque no es así.
"¿A qué atribuye usted ese coraje que ella le tiene a usted, esa indignación que demostró ahí en la silla, en contra de usted?
"Porque me tienen un odio personal.
"¿Quién?

"'Ellos mismos.

"'¿Pero la muda, la muda?

"'La muda.

"'¿Por qué?

"'Pues no sé por qué será.

"'¿Usted es familiar de ella?

"'Sí. Pero usted puede tener un hermano y le puede coger odio también.

"'¿Por qué le tiene ella odio a usted, hasta ese extremo de acusarlo en esa forma?

"'No sé por qué me tendrá odio.

"'¿Pero usted la oyó esta mañana acusándole a usted en esa forma?

"'Testigo: Sí, lo oí.

"'Fiscal: ¿No sabe por qué será ese odio contra usted?

"'No sé por qué será.''

El jurado apreció la prueba y declaró culpable a Ignacio Flores de un delito de violación. Entendemos que hubo prueba de corroboración, y que esta prueba, creída por el jurado, fué suficiente para declarar culpable al acusado. Se desestima, por tanto, el último error basado en que el veredicto es contrario a la prueba.

*Debe confirmarse la sentencia apelada.*

El Juez Asociado Señor Hutchison está conforme con el resultado.