EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* MARCELINO RIVERA, acusado y apelante.

No. 5737.—*Sometido:* Diciembre 4, 1935. *Resuelto:* Febrero 21, 1936.

*Arturo Aponte, Faustino R. Aponte* y *R. García Cintrón,* abogados del apelante; *R. A. Gómez, Fiscal,* abogado de El Pueblo, apelado.

EL JUEZ PRESIDENTE SEÑOR DEL TORO, emitió la opinión del tribunal.

Marcelino Rivera fué acusado ante la Corte de Distrito de San Juan por su fiscal como autor de un delito de asesinato cometido en la persona de Domingo Bonano en Río Grande, P. R., el día 24 de mayo de 1933.

Alegó su inocencia y solicitó juicio por jurado. El juicio se celebró en noviembre 24, 1933, rindiendo el jurado un veredicto de culpable de homicidio. Presentó una moción de nuevo juicio que fué declarada sin lugar, dictando la corte su sentencia condenándolo a tres años de presidio. Apeló

para ante este tribunal y en su alegato sostiene que la corte sentenciadora erró al no anular el veredicto y al no conceder el nuevo juicio, errando además al negarse a admitir en evidencia una certificación creditiva de haber sido condenado el interfecto a tres años de presidio por el delito de ataque para cometer violación.

▮ Hemos estudiado la evidencia aportada por ambas partes. La del Pueblo tiende a demostrar que Marcelino Rivera, el acusado, mayordomo de la colonia Blasina, había ajustado con Domingo Bonano, el interfecto, el desyerbo de una pieza de cañas; que en la mañana del 24 de mayo de 1933 estuvo el acusado en la pieza y el interfecto le pidió un adelanto, contestando el acusado que no había dinero; que el interfecto dijo a los que con él trabajaban "si no hay adelanto, nos vamos, vámonos muchachos"; que el acusado manifestó "no se vayan, que después nos arreglamos", expresando el interfecto "si nos arreglamos, deme un anticipo para ir a buscar almuerzo a esta gente a la tienda", respondiendo el acusado "vénganse que yo se lo doy por allá abajo" y siguió en su caballo y tras él el interfecto.

Nada más presenciaron los obreros del desyerbo llamados a declarar por El Pueblo. Poco después, Nicolasa Millán y Eusebia Aquino, que estaban lavando ropa en una quebrada, declaran que sintieron un tiro y casi en seguida pasó el acusado a caballo y dijo "vayan para allá que le he pegado un tiro a uno, a ver si está vivo o muerto." Las mujeres fueron y ambas dicen que encontraron vivo a Bonano, que "al momento de haber llegado, murió."

¿Cómo ocurrió el encuentro? La evidencia aportada por el Pueblo consistió en la declaración de María Rodríguez. Testificó que desde su casita vió al acusado montado en su caballo y lo oyó dando órdenes a unos peones que tenía trabajando "y entonces llegó Domingo Bonano donde estaba don Marcelino Rivera y le dijo: '¿Usted me llama? . . . don Marcelino escribía así . . . Bonano hablaba con un paquetito que llevaba así en la mano derecha . . . hablaba y le hacía

así al acusado con la mano izquierda y después se apeó don Marcelino y entonces siguió hablando Domingo y él. Yo le vi a él parado así y Domingo le hablaba, pero en una que hizo así, él hizo como que alteró la voz, hizo así, y ahí le pegó el tiro.''

Comienza la prueba del acusado por la declaración de Juan Morales. Manifestó que María Rodríguez le había dicho que ella oyó un tiro pero que nada había visto.

Siguió Eduvigis Marrero. Expresó que trabajaba al lado en que lo hacía Bonano. El acusado llegó, inspeccionó el trabajo de Bonano y encontrando algunas yerbas, le ordenó que lo repasara, a lo que se negó, contestándole don Marcelino que no lo pondría en lista, y se marchó. Bonano pidió a su hijo una lima y suspendió a los peones, y después de manifestarle al testigo ''yo me voy para allá y me doy dos matracazos y dondequiera que me encuentre con él vamos a tener un disgusto'', se fué.

Carlos Luis Marrero declaró que oyó gritando a Bonano: ''Don Marcelo, párese ahí.'' Don Marcelo se paró y al llegar Bonano lo agarró por la camisa y se la estrujó. Se tiró del caballo por el lado contrario y Bonano se le fué encima rápidamente y ''ahí siento un disparo y entonces vi que el Sr. Domingo Bonano dió media vuelta y cayó al suelo y yo llegué y al llegar estaba boca abajo y el Sr. Marcelino Rivera tomándole una lima que tenía debajo de la mano.'' El acusado ''montó en su caballo y se marchó.''

Fué a la silla de los testigos el propio acusado. Depuso que estuvo examinando entre siete y ocho de la mañana el desyerbo ajustado con Bonano y encontrándolo mal, le ordenó que lo arreglara, y como se negara, le expresó que no lo pondría en la lista. Se fué y cuando bajaba a almorzar como entre diez y once Bonano lo llamó y no le hizo caso y siguió andando. Luego ''viró el caballo para donde Bonano al decirle éste 'no me va a atender, don Marcelo?' Al acercarse Bonano le dijo 'usted me dijo esta mañana que no me iba a pagar el trabajo, y aquí me lo va a pagar de macho a

macho' . . . y se le vino encima. El declarante se fué por el lado izquierdo y Bonano cambió y sacó una lima que llevaba en la cintura, y volvió y se le fué encima; el testigo se echó para atrás, y le pegó un tiro. Que el declarante conocía a Domingo Bonano de antes, hacía tres o cuatro años.

Muestra la exposición del caso que entonces ocurrió lo que sigue:

"En este instante el fiscal solicitó de la corte que se retirara el jurado para plantear una cuestión, a cuya solicitud accede el tribunal, saliendo del salón el jurado . . . .

" 'Sr. Juez: La única cuestión que voy a plantear es la siguiente: Domingo Bonano ha cumplido una condena de tres años de presidio por un delito de ataque para cometer violación. Entendemos que eso es impertinente e inmaterial, a la cosa que estamos investigando. La defensa puede presentar prueba de que Domingo Bonano era el ser más pendenciero y más sanguinario que imaginarse pueda, porque ya ha sentado las bases para ello. Pero no puede traerse en manera alguna una condena por violación en grado de tentativa.'

"El acusado por medio de su abogado, se produjo de esta manera:

" 'Queremos demostrar que el acusado se encontraba en inminente peligro con respecto al fenecido y que siendo como era notoria la reputación del muerto en la comunidad donde vivía como una persona turbulenta, díscola, violenta, agresiva y peligrosa, y conociendo, además, el acusado esa reputación, y encontrándose en aquella posición cuando se vió agredido por este individuo, a los efectos de determinar la disposición de ánimo por parte del acusado, ofrecemos esta evidencia, porque no es lo mismo que un hombre se enfrente con otro hombre pacífico y bueno, a que se enfrente con un hombre peligroso y que ha acometido también a mujeres, porque la violación no es nada más que un acometimiento y puede ser castigada también como acometimiento. No se puede exigir de un ciudadano el mismo grado de circunspección y prudencia cuando se encuentra frente a un individuo bueno de la comunidad que cuando se halla con una persona que ha sido licenciada de presidio, convicto de ataque para cometer violación. Además, el ataque de una persona para cometer violación o cualquier acometimiento a una mujer, inclusive besarla, implica la idea natural de que una persona que tal cosa hace pueda estar sujeta al ataque de los familiares de esa persona, y por tanto es un indicio de hombre pendenciero y agresivo, dispuesto a arrostrar todas las consecuencias de actos como éste. En relación con esos

fines, ofrecemos como parte de la evidencia una certificación del jefe del presidio de Puerto Rico creditiva de que el interfecto desde 1922 a 1925 cumplió en el presidio de esta isla una condena de tres años por ataque para cometer violación.'

"La Corte declaró con lugar la oposición del fiscal, no admitiendo la certificación y anotando el acusado una excepción.

"El Jurado volvió al salón, y el testigo continuó declarando a preguntas de la defensa:

" 'Que sabía la reputación de que gozaba en la comunidad Domingo Bonano; que como hombre de paz gozaba de una reputación mala; estaba desacreditado en el barrio como hombre pendenciero y guapo. Que conocía ciertos actos específicos llevados a cabo por Bonano que demostraban que era un hombre pendenciero y díscolo. Que una vez Bonano cogió un sable y agolpeó un hijo, cumpliendo una condena de 6 meses de cárcel; también agolpeó a su mujer, y fué condenado por acometimiento y agresión por ese hecho, y cumplió un mes de cárcel, que además fué condenado por alterar la paz, por riña, etc. Que el día del suceso cuando el declarante tuvo ese encuentro con Bonano, sabía que ése era su carácter y reputación en la comunidad: era un hombre peligroso.''

En su alegato el apelante argumentando su primer señalamiento de error sostiene que no hubo conflicto en la evidencia aportada por una y otra parte y que apreciada rectamente la prueba en su totalidad demuestra que el acusado actuó en legítima defensa.

A nuestro juicio la evidencia es contradictoria y la de cargo sostiene el veredicto del jurado. Éste creyó la declaración de María Rodríguez y creyéndola pudo declarar como declaró culpable de homicidio al acusado sin la concurrencia a su favor de la legítima defensa.

Argumentando el otro error que señala, el acusado hace algunas citas generales de jurisprudencia y agrega:

"Y no se arguya que una convicción por un delito de ataque para cometer violación no arroja luz sobre el carácter pendenciero y díscolo del interfecto. El delito de violación o la tentativa para cometer violación necesariamente implican fuerza o violencia; en otras palabras, en el delito de violación está comprendido el de acometimiento y agresión. Así lo ha resuelto este Hon. Tribunal en el caso

de El Pueblo v. Arroyo, 38 D.P.R. 534, donde se produjo en la forma siguiente:

" 'Hay un precepto en el Código de Enjuiciamiento Criminal que dice: "Art. 286. El jurado podrá declarar al acusado culpable de la comisión de cualquier delito, necesariamente comprendido en el delito imputádole, o de tentativa de cometerlo." Y la verdad es que en el delito de violación cometido por fuerza y violencia, y aún quizás en cualquiera otra de sus formas, está comprendido el de acometimiento y agresión.'

"En armonía con la doctrina sentada por los tribunales norteamericanos y por todos los tratadistas de derecho penal, este Tribunal Supremo ha resuelto que constituye error revocable el ordenar la eliminación de aquella parte de la declaración del acusado que se refiere a actos específicos realizados por el interfecto, expresándose el Tribunal en esta forma:

" 'Cuando un acusado declara sin oposición contraria sobre actos específicos del interfecto para explicar los fundamentos de la creencia que tenía él de sufrir grave daño corporal en el momento en que fué atacado por aquél, la eliminación posterior de tal prueba del récord es un error reversible.' (Pueblo v. Pérez, 36 D.P.R. 713.)

"Y no se diga que el hecho de haberse permitido al acusado declarar sobre otros actos específicos del interfecto curan el error alegado.

" 'An error in excluding evidence as to the general reputation of the deceased as to resorting to the use of firearms when engaged in quarrels is not cured by the fact that ample testimony as to his reputation as an aggressive and dangerous man has been introduced.' (Wharton on Homicide, (Tercera Edición) 436.)

"Esta conducta del tribunal inferior lesionó gravemente los derechos del acusado, pues si esta prueba de que el interfecto había sido licenciado del Presidio hubiese llegado a oídos del jurado, seguramente hubiese sido otro el veredicto rendido, ya que por regla general, la persona convicta de un *misdemeanor,* cualquiera que sea el delito, no infunde en la mente de un hombre razonablemente prudente el mismo temor que puede infundir quien haya cumplido varios años de presidio."

En su obra sobre Evidencia Criminal, pág. 1110, párrafo 562 de la edición de 1935, dice Underhill:

"Prueba de la quieta y pacífica disposición del interfecto o de sus hábitos de sobriedad y de su reputación en general como una persona buena o un ciudadano digno, no es admisible por adelantado.

Tal prueba es solamente admisible para refutar evidencia aducida por el acusado contra el interfecto, o para refutar prueba introducida por el acusado demostrando amenazas del interfecto contra él, si tales amenazas se alega que fueron hechas antes del hecho. Prueba del mal carácter del interfecto que resulte inmaterial o irrelevante a la controversia, no puede ser presentada por el acusado. También es regla establecida que prueba de la reputación del interfecto de ser hombre turbulento, violento o perturbador, es inadmisible a menos que las circunstancias del caso demuestren que el acusado actuó en defensa propia. Un asesino no está excusado de matar meramente porque la persona asesinada fuera un mal hombre, pero cuando la evidencia demuestra, aunque sea en bajo grado, que la muerte ocurrió en defensa propia, o demostrare o probare demostraciones hostiles del interfecto contra el acusado en el momento de la muerte, es siempre material demostrar que el interfecto era una persona pendenciera y vengativa, siempre que aparezca que su reputación como tal era conocida del acusado. En casos donde el acusado alega la defensa propia, puede probar que el interfecto tenía la costumbre de usar pistola o armas prohibidas. Pero como cuestión previa a tal presentación de esa evidencia, el acusado debe demostrar alguna justificación y demostrar también que tenía conocimiento de la costumbre del interfecto de llevar armas prohibidas.

"En algunos estados, las amenazas del interfecto o su carácter turbulento o pendenciero no son admisibles cuando se prueba que en el momento de la muerte, él atacó al acusado o hizo demostraciones hostiles contra él o demostró la intención de llevar a cabo algún acto de grave daño corporal . . . .

". . . . El peso de las autoridades rehusa la admisión de evidencia para demostrar el carácter moral del interfecto, por ejemplo, su inclinación para actuar bien; pero admite su reputación en general que prevalece en la comunidad. La reputación del interfecto de ser vengativo o turbulento, no puede deducirse por hechos específicos de violencia a tercera persona, a menos que tales hechos no estén de tal manera conectados con el hecho fatal en controversia que pueda producir una razonable aprensión de que trataba de producir grave daño corporal, como por ejemplo, que siendo el interfecto un convicto fugado de la justicia, trataba de matar a una tercera persona . . . . La reputación del interfecto con respecto a actos de castidad, es ordinariamente inadmisible. La prueba para demostrar el carácter del interfecto, debe ser por supuesto en relación con su reputación acerca de hechos de la misma naturaleza del que se trata en el caso de autos y no de actos específicos con respecto a su carácter . . . Es con res-

pecto a su reputación y carácter pacífico y no pendenciero al tiempo de cometerse el hecho en controversia, lo que debe admitirse y ése debe ser el *standard* para resolver la materialidad de la evidencia ofrecida.''

Es cierto que el ataque para cometer violación envuelve un acometimiento, pero es el acometimiento hecho a una mujer para realizar actos carnales con ella. El impulso criminal es de naturaleza distinta al del acometimiento que lleva al hombre de carácter pendenciero a acometer, a herir, a matar a sus semejantes y lo convierte en persona peligrosa contra la cual otra que con ella se encuentra y que lo sabe, está justificada en tomar las necesarias precauciones para defenderse.

Siendo ello así y habiéndose permitido como se permitió declarar al acusado con toda amplitud sobre la reputación del interfecto en la comunidad y sobre los actos específicos por él realizados dentro de su conocimiento demostrativos de su carácter pendenciero, no puede concluirse que fuera errónea la actitud asumida por la corte.

Y examinando la prueba de cargo a la luz del carácter pendenciero del interfecto, aun así no es posible concluir que el acusado estuvo justificado al dar muerte como dió al interfecto. Ello puede explicar la condena de tres años de presidio que le impuso la corte sentenciadora cuando pudo condenarlo a diez, pero no es motivo para que esta corte revoque la sentencia y absuelva al acusado.

*Debe declararse sin lugar el recurso y confirmarse la resolución y la sentencia recurridas.*

El Juez Asociado Señor Córdova Dávila no intervino.