EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* COSME QUINTANA, acusado y apelante.

Núm. 5859.—*Sometido:* Febrero 11, 1936. *Resuelto:* Mayo 27, 1936.

R. *Martínez Nadal, F. Navarro Ortiz* y *F. González Fagundo*, abogados del apelante; *R. A. Gómez, Fiscal* y *Luis Janer, Fiscal Auxiliar*, abogados de El Pueblo, apelado.

EL JUEZ PRESIDENTE SEÑOR DEL TORO, emitió la opinión del tribunal.

El Fiscal del Distrito de Humacao formuló acusación contra Cosme Quintana, imputándole la comisión de un delito de asesinato en primer grado, como sigue:

"El referido Cosme Quintana el día 18 de abril de 1934, en la municipalidad de Juncos, dentro del distrito judicial de Humacao, P. R., ilegal y voluntariamente, con malicia premeditada y propósito deliberado y firme de darle muerte ilegal al ser humano Eloy Juncos, hizo varios disparos de revólver contra éste, con uno de los cuales le ocasionó una herida en el lado izquierdo del pecho, a consecuencia de la cual falleció el referido Eloy Juncos allí y entonces."

Hizo el acusado alegación de no culpable y solicitó juicio por jurado. El 4 de febrero, 1935, comenzó la vista que continuó el 5 y terminó el 6, rindiendo el Jurado veredicto de culpable de homicidio voluntario.

En abril 5, 1935, presentó el acusado una moción de nuevo juicio que fué declarada sin lugar el 9 de mayo siguiente. Apeló. Y dictada finalmente sentencia en mayo 24,

1935, imponiéndosele diez años de presidio con trabajos forzados, también apeló para ante este tribunal. Ambos recursos se han tramitado y serán resueltos conjuntamente.

En su alegato señala el apelante tres errores. Los dos primeros se atribuyen a la corte como cometidos al denegar la moción de nuevo juicio y al imponer al acusado la pena de diez años. Por el tercero se sostiene que el veredicto es contrario a la evidencia.

Antes de comenzar el estudio del caso parece conveniente referirnos a la teoría del fiscal y a la de la defensa, al presentarlo al jurado.

Dijo el primero:

"El Fiscal para probar su caso, someterá a la consideración de los Sres. jurados, prueba pericial, o sea la declaración del doctor Agustín Mújica, quien atendió en el Hospital Municipal de Juncos, al herido Eloy Juncos y quien una vez fallecido Eloy Juncos, practicó la autopsia, encontrando que la muerte había sido producida por una intensa hemorragia, a consecuencia de un disparo de revólver. Prueba testifical de personas, que en el momento en que ocurría el suceso, vieron cuando el acusado disparó contra Eloy Juncos, quien cayó de la acera al suelo, y prueba objetiva, consistente en el arma ocupada en poder de Cosme Quintana en los segundos seguidos a los disparos por él realizados. El Fiscal tenderá a probar que este día 18 de abril de 1934, el interfecto Eloy Juncos salió del pueblo de Caguas, acompañado de sus familiares con dirección al pueblo de Juncos; que en llegando frente a la plaza del pueblo de Juncos el interfecto se bajó del carro, conduciendo a los familiares de éste hacia la casa de don Francisco Franqui, donde vivía una hija de éste, la señorita Luz Virginia Franqui, quien era prometida del señor Eloy Juncos. El señor Juncos se detuvo un rato en la plaza de dicho pueblo, hablando con varios amigos, entre ellos el Jefe de la Policía, Sr. Torres, y otros amigos. De allí cogió rumbo a la derecha, cogió por la calle Martínez, creo que se llama, y se dirigía a tomar la calle, la carretera que sale para Gurabo, y como siete u ocho metros antes de llegar a la esquina, para doblar a la izquierda, se le enfrentó el acusado Cosme Quintana, quien lo detuvo, y en el acto sacó un revólver marca Smith & Wesson y se lo pegó sobre el costado izquierdo, y le disparó a quemarropa un tiro, y cuando Eloy Juncos caía de la acera de la calle le hizo un segundo disparo, en cuyo momento se pre-

sentó el guardia Ayala, quien intervino en el acto, arrestando a Cosme Quintana y conduciéndole al cuartel de la policía. Probaremos también que el acusado Cosme Quintana en la mañana de ese día, y en la tarde de ese día, había estado buscando a Eloy Juncos, en la casa de don Francisco Franqui, la última de estas visitas fué allá alrededor de las cinco o cinco y media, preguntando a doña Rosa Franqui, suegra del acusado Cosme Quintana, y tía de Virginia Franqui, la prometida de Eloy Juncos, preguntando por Eloy Juncos, y contestando ella que Eloy Juncos no vivía en aquella casa. De allí salió el acusado y como a la hora o a la hora y media de estas diligencias por él realizadas, efectivamente se topó con Eloy Juncos, haciéndole dos disparos, uno de los cuales le produjo la muerte."

Terminó El Pueblo de practicar su prueba y antes de introducir la suya el acusado, por medio de su abogado defensor, se expresó así:

"Sr. Juez y caballeros del jurado, nuestra teoría es la misma del juicio pasado. Nuestra teoría es que Eloy Juncos era una persona que estaba en una mala posición económica, hasta el extremo de haber sido desahuciado del establecimiento que tenía; y persona que acostumbraba a usar armas de fuego; que había sido ya denunciado una vez, y aparte de contar como treinta y cinco años de edad, se fijó en los encantos de una niña de diez y seis años, Luz Virginia Franquis, hija de don Francisco Franquis, persona estimada y respetada en la comunidad de Juncos, acaudalado, siendo esta niña, hija única de él, y por tanto la heredera de todos sus bienes. Que al principio el señor Franquis se opuso a estas relaciones amorosas, cosa que contrarió al señor Juncos intensamente; que naturalmente lo que pasa en esos casos, la niña entró en relaciones amorosas con el señor Juncos, y que después el señor Franquis accedió a no oponerse más a virtud de la intervención de ciertos amigos; que el señor Juncos tenía mucha prisa por casarse. El Sr. Franquis había estado gravemente enfermo en esos días, había tenido que estar asilado en el Auxilio Mutuo, y que mientras estuvo el señor Franquis en el Auxilio Mutuo, el señor Eloy Juncos tratando de precipitar esa boda amenazó a la hija para que contrajera matrimonio con la oposición del padre, tuvo unas palabras con ella en la ciudad de Caguas, en que le disparó un tiro con el propósito de atemorizarla que le causó un leve rasguño en la pierna a la Srta. Luz Virginia Franqui; que enterado el padre del suceso estando enfermo en el Auxilio Mutuo entonces ordenó que

se le prohibiera la entrada al Sr. Juncos en su casa, hasta que él estuviera bueno y regresara a su hogar para disponer lo que fuera conveniente disponer; que esta medida encolerizó al Sr. Juncos, y que atribuyéndola posiblemente a una intervención del acusado Cosme Quintana, profirió varias amenazas de muerte contra el Sr. Cosme Quintana, el acusado, amenazas de muerte que le fueron comunicadas al Sr. Cosme Quintana, y que ya sabía que tenía en el Sr. Eloy Juncos un enemigo mortal, dispuesto según sus propias palabras, a quitarle la vida. Que el día de los sucesos el Sr. Juncos vino de Caguas a Juncos con el propósito de ultimar el asunto del matrimonio y casarse de cualquier modo con la Srta. Luz Virginia Franquis, propósito que anunció a viva voz en una de las calles de Juncos diciendo que había venido a resolver el asunto, que tenía que resolverlo esa noche así tuviera que matar o que lo mataran. Que momentos después de esas últimas palabras del Sr. Juncos, se cruzaron en el sitio en que dicen los testigos de cargo, en la calle Martínez que hace esquina a la calle Muñoz Rivera. El Sr. Cosme Quintana iba por la acera como con dirección a coger la calle para su casa, y el Sr. Eloy Juncos venía de la plaza por la otra acera, que al ver al Sr. Cosme Quintana cruzó la calle y se vino a la acera donde iba Cosme Quintana, que allí hubo una discusión breve, acalorada y breve que partió del Sr. Juncos, durante la cual inmediatamente el Sr. Eloy Juncos le dió un revés al Sr. Cosme Quintana, y llevándose inmediatamente la mano al bolsillo del pantalón a sacar un arma para usarla, y que en ese instante Cosme Quintana hizo uso de un revólver que portaba, a su vez lo sacó y le disparó inmediatamente; y que al recibir el disparo de Cosme Quintana, Eloy Juncos cayó de la acera a la calle, se le esmongaron las piernas y cayó.''

El primer señalamiento de error, o sea el atribuído a la Corte al negar la concesión de un nuevo juicio, se subdivide en doce.

Las cuatro primeras subdivisiones guardan relación con la declaración de la testigo Rosa Franquis. Se sostiene que la Corte erró al permitir al fiscal interrogarla sobre su parentesco con Francisco Franquis, al permitir que le hiciera las siguientes preguntas: ¿Cuánto tiempo estuvo llevando relaciones (Eloy Juncos) con la Srta. Luz Virginia Franquis?'' y ''¿En visitas que él iba a hacerle a su casa, recuerda si en alguna ocasión habló usted con Cosme Quin-

tana sobre Eloy Juncos?'', y al negarse a eliminar totalmente su declaración.

La defensa objetó las preguntas sobre parentesco y las otras específicas que dejamos transcritas por inmateriales e impertinentes. Con respecto a la eliminación, muestra el récord lo que sigue:

"Lcdo. Martínez Nadal.—Voy a solicitar la eliminación total de la declaración de la testigo y especialmente la que tiende a demostrar la conversación entre Cosme Quintana. Esta testigo, V. H., se recuerda muy bien, se la ha preguntado sobre conversaciones sobre Cosme Quintana. etc. Pero voy a hacer una salvedad, yo pido la eliminación total de la declaración de la testigo menos aquella parte que se refiere a que Cosme Quintana a medio día le preguntó por Eloy Juncos. Eso es lo único que yo creo que debe quedar en récord de esta conversación; porque de que entró por la mañana y habló con su esposa y que tenían coraje, de eso no ha dicho nada de qué hablaron y por qué era ese coraje, y después por la tarde dice que Cosme Quintana vino solo, entró hasta la antesala y lo único que oyó que dijo fué 'DE HOMBRE A HOMBRE', pero sin decir amenazas o nada contra Eloy Juncos, sino simplemente esas palabras; por tanto, Sr. Juez ¿cómo va a quedar eso en el récord? Yo admito que eso que dije antes debe quedar en el récord pero lo demás no establece ninguna clase de conexión con el Sr. Juncos; por tanto pedimos la eliminación total de la declaración de la testigo excepto de esas palabras que Cosme Quintana le dijo cuando le preguntó por Eloy.

"Hon. Fiscal.—Para sostener que debe prevalecer en el récord en su totalidad la declaración de la testigo porque ahora es que está conectada perfectamente y como complemento de la declaración dada por la señora Juncos de García y Eduardo F. Torres, por la circunstancia de haber mediado ya el hecho de haber procurado a Eloy Juncos a estas horas de la tarde y haber venido después, como consecuencia, el hecho sangriento en que perdió la vida el referido Eloy Juncos. . . .

"Hon. Juez.—La Corte entiende que es eliminable todo lo referente a Cosme Quintana, excepto la frase de Cosme Quintana por la mañana cuando dijo: 'DE HOMBRE A HOMBRE', y a la pregunta de Cosme Quintana por Eloy Juncos en la casa de la testigo, a pesar de que dijo que hablaban en alta voz, etc. En este sentido se declara sin lugar la moción eliminatoria, o sea excepto las partes que antes

dije respecto a las palabras de Cosme Quintana, 'DE HOMBRE A HOMBRE' a la pregunta que hizo Cosme por Eloy.

"LCDO. MARTÍNEZ NADAL.—Tomamos excepción de la resolución de la corte por no eliminar las palabras 'DE HOMBRE A HOMBRE', por lo que nosotros, a fin de estar descansando en nuestra moción, no queremos preguntarle a la testigo."

Si se examina la declaración de la testigo en relación con la acusación y la teoría del caso expuesta por el fiscal al jurado, se concluye que el testimonio de Rosa Franquis no era inmaterial y que las frases "de hombre a hombre" pudieron y debieron quedar en récord. La declaración tendía a mostrar antecedentes explicativos de la actuación deliberada del acusado. No hubo error, y de haberlo, no resultaría perjudicial, ya que el veredicto no fué de asesinato sino de homicidio.

Las cuatro subdivisiones siguientes se refieren a la declaración de Juanita Juncos de García. Se alega que erró la corte de distrito al permitir que se hicieran a la testigo las siguientes preguntas: "¿Cuando usted visitó en el hospital y vió a Eloy Juncos muerto según usted ha dicho, usted vió la ropa de él?" y "¿Ese gabán tenía alguna seña particular que usted recuerde?"; al admitir en evidencia el traje que vestía Eloy Juncos la noche del suceso y al negar la eliminación total de la declaración de la testigo.

La posición asumida por la defensa se basó y se basa en que habiéndose ya probado el hecho de la muerte de Eloy Juncos a consecuencia de un disparo de bala, la evidencia era innecesaria y se presentaba con el solo propósito de impresionar indebidamente al jurado en contra del acusado. Cita del caso de *McKay* v. *State* de la Corte Suprema de Nebraska reportado en American Annotated Cases 1913-B, 1934, p. 1039 (135 N. W. 1024, 39 L.R.A. (N. S.) 714) lo que sigue:

"Puesto que el caso tendrá que ser visto de nuevo, nos abstendremos de emitir opinión respecto al peso de la prueba y consideraremos tan sólo uno de los errores planteados en relación con la misma. Se sostiene que la Corte cometió error al admitir como

prueba los *exhibits* 6, 7, 18, 19 y 22. Los *exhibits* 6 y 7 consistían de dos camisas manchadas de sangre, el 18 era la chaqueta, el 19 el chaleco y el 22 la gorra del interfecto. La declaración del médico forense, que era un médico cirujano en ejercicio, demostraba de manera concluyente que el occiso había recibido tres golpes en la parte lateral de su cabeza, cada uno de los cuales le fracturó el cráneo, y dos de los cuales le penetraron el cerebro, y cualquiera de los que, según el doctor, hubiera bastado para producir la muerte. De manera que quedó claramente establecido que el interfecto había sido asesinado. No había lugar a argumentar que las heridas habían sido inferidas por sí mismo, y la única cuestión ante el jurado fué: ¿Cometió el acusado el asesinato? El admitir estas prendas de vestir manchadas de sangre y el mostrarlas al jurado en forma alguna identifican, o aun tiende a identificar, al acusado como el asesino. No podemos concebir ningún otro fin para el cual pudieran servir estos *exhibits* que el de excitar las pasiones e impresionar la mente del jurado. Un acusado que está siendo juzgado de cualquier delito, y en particular de uno que posiblemente conlleve la pena capital, tiene derecho a ser juzgado a base de prueba admisible, de prueba que tienda a demostrar su culpabilidad o inocencia, y no a base de prueba que no tenga esa tendencia, sino que sirve simplemente para desviar la mente del jurado de la verdadera contienda hacia *exhibits* horripilantes que fácilmente pueden inducirle a una conclusión errónea."

Sanos son los principios en que se inspira la Corte Suprema de Nebraska. La sentencia apelada ante ella debía revocarse por otros motivos que constan de su opinión y una vez que los expuso agregó el párrafo transcrito para que sirviera de guía a la corte *a quo* en los ulteriores procedimientos.

Aquí la situación es distinta, ya que no surge de los autos que la intención del Pueblo al aportar la prueba fuera la de influenciar indebidamente al jurado.

"La ropa de la víctima en un caso de homicidio", dice Underhill, Criminal Evidence, 2nd ed., pág. 79, sec. 48, "si es debidamente identificada, puede exhibirse dentro del principio de que forma parte del *res gestae,* para ilustrar al jurado sobre el carácter y naturaleza de las heridas, móviles del crimen, manera y medios en que se ocasionó la muerte, o

para demostrar la proximidad del acusado a la víctima al ocurrir la muerte.''

Siguió el fiscal esa regla. No introdujo toda la ropa manchada de sangre que vestía el interfecto. Presentó el gabán perforado de bala por el sitio por donde cogió fuego, demostrativo de un disparo hecho ''a boca de jarro'', para completar y explicar las declaraciones de los testigos en relación con la diferente intensidad de las dos detonaciones que oyeron.

No erró, pues, la corte al admitir la prueba, ni al negarse a eliminar totalmente la declaración de la testigo, hermana del interfecto. Su declaración sirvió para indicar al jurado lo que hizo Juncos el 18 de abril de 1934, desde que salió de Caguas por ella acompañado hasta momentos antes de recibir las heridas, sin que pueda la defensa alegar lo improcedente del testimonio cuando ella misma al exponer la teoría de su caso alegó que el propósito del viaje de Juncos fué ultimar su matrimonio con Luz Virginia Franquis.

 En las subdivisiones novena y décima se insiste en que la corte erró al declarar sin lugar la oposición de la defensa al examen que se estaba haciendo al testigo Luis Ortiz, sobre si el chaquetón de Juncos echaba humo y si el testigo lo conocía, y al permitir que se preguntara al testigo Arturo Meaux si vió el gabán del herido que tenía como una brasa de candela.

Luis Ortiz fué un policía que recogió a Juncos ya herido. El fiscal le preguntó ''¿En qué sitio fué que usted buscó a ver si había armas?'' Y el testigo contestó: ''En el sitio en que estaba el herido, y entonces se volteó y por este lado de aquí, por el izquierdo, pues tenía el chaquetón que botaba humo. . . .'' No objetó la defensa. La objeción la hizo al insistir el Fiscal.

Arturo Meaux sintió las detonaciones y vió a dos hombres. Se escondió y al salir de su escondite vió al policía Ayala con uno de los hombres que tenía un revólver en la mano. Se acercó al otro que estaba en el suelo, lo movió y

comprendió que estaba vivo y "le notó una braza de candela hacia el lado izquierdo del gabán."

Basta exponer lo ocurrido para concluir que no hubo error. Ambos testigos declararon sobre hechos que vieron, que directamente apreciaron y que están estrechamente relacionados con el acto que acababa de realizar el acusado imputádole por el Fiscal como constitutivo de un delito de asesinato.

■ Por la subdivisión once se sostiene que la Corte erró al no permitir que el testigo Manuel Jiménez declarase sobre el carácter del interfecto probando actos específicos por él cometidos.

El incidente que da origen al señalamiento ocupa varias páginas del récord. Finalmente se resolvió como sigue:

"JUEZ.—La cuestión es la siguiente: la Corte no tiene la menor duda de que actos específicos del acusado, digo, del fenecido, que indiquen el carácter violento y agresivo por parte del fenecido, son admisibles cuando se establece la defensa propia, pero cumpliéndose el requisito de que han debido de ser estos actos conocidos por el acusado al tiempo en que dice que ejercitó el derecho de defensa propia; y ése hasta ahora no se ha probado aquí, con relación al acto específico que se intenta probar.

"DEFENSOR.—Pero un testigo declaró aquí ante la Corte que las amenazas que Eloy Juncos hizo referente a Cosme Quintana, este testigo se las comunicó a Cosme Quintana.

"JUEZ.—Se declara con lugar la oposición, aún cuando la declaración sobre este extremo puede ser admisible después que se cumplan los requisitos legales antes expuestos."

No hubo error. Véase el caso de *El Pueblo* v. *Rivera*, 49 D.P.R. 622, 625.

■ La subdivisión doce, que es la última, se refiere a la admisión en evidencia de las medias que usaba Luz Virginia Franquis cuando según la prueba de la Defensa su novio el interfecto le disparó en Caguas hiriéndola en una pierna para lograr que no asistiera a cierto acto que iba a celebrarse en San Juan, en el Ateneo.

La testigo Rosa Franquis, abuela de Virginia, llamada en *rebuttal,* identificó las medias. La defensa hizo una serie de repreguntas y se opuso a la admisión de las medias porque la testigo había dicho eran color marrón y las presentadas no lo eran.

Realmente la testigo demostró que podía equivacarse al ser sometida a prueba por el abogado defensor sobre el color de su corbata y quizá la corte no debió haber admitido en evidencia las medias. Sin embargo, si hubo error, no fué perjudicial a nuestro juicio. El incidente del disparo tendente a demostrar el carácter violento del interfecto, quedó ante el Jurado con lujo de detalles. La presentación de las medias que estaban sanas se dirigía a demostrar que no hubo herida en la pierna, pero no que no se hizo el disparo, cuyo motivo en verdad fué el de amedrentar a la novia y lograr como se logró en efecto que no asistiera a la fiesta. Si la novia recibió un rasguño o no, no era de importancia decisiva.

Analizadas todas las subdivisiones del primer señalamiento, quedamos convencidos de que la corte estuvo justificada al negar el nuevo juicio, convencimiento que se fortalece al estudiar en su totalidad el caso.

Veamos ahora si el veredicto es contrario a la prueba y si la pena impuesta es excesiva, como sostiene el apelante.

El acusado admite que fué el causante de la muerte, pero alega que actuó en legítima defensa.

Su testigo Gregorio Montañez dijo que oyó a Eloy Juncos manifestar en Caguas refiriéndose al acusado: ''Este individuo es el que tiene la culpa de lo que a mi me sucede y tengo que ventilar con él este asunto'', sacando en ese momento un revólver y replicando a los consejos de Montañez que estaba decidido, que ''el mundo es del valiente'', habiendo comunicado el testigo esas amenazas al acusado.

Francisco Franquis declaró con respecto a la comisión que diera al acusado tendiente a poner término a los amores de su hija con el interfecto y los testigos Mariano Villaronga,

Vieta de Miranda, Engracia Ramos, Ramiro Vázquez y Fernando Hernández se refieren al incidente del disparo hecho en Caguas por el interfecto a su novia para lograr que no asistiera a cierta fiesta en San Juan. Manuel Giménez refiere que desahució por falta de pago a Eloy Juncos quien le dijo que pensaba casarse con la hija de Franquis.

Juan Corsino manifestó que fué comisionado por Franquis para sacar a Luz Virginia de la escuela y decir a la dueña de la casa que habitaba en Caguas que suspendiera las visitas de Juncos a su hija. Arturo Meaux llamado por la defensa dijo que Juncos llegó una vez donde él muy nervioso y le contó que el acusado lo había echado de la casa de su novia, y le pidió un revólver para arreglar cuentas con el acusado, desistiendo a virtud de los consejos del testigo, y el Dr. Barreras declaró que el acusado "es un hombre que no habla con nadie, muy callado, nunca he sabido que haya tenido cuestión ni disgustos con ningún vecino . . . tiene una conducta moral intachable, buen padre y buen esposo." José Rubio refirió que la noche del suceso oyó que desde un carro decían a Juncos, "Eloy, vámonos para Caguas", a lo que contestó, "no, yo he venido con una hermanita mía y he venido a resolver un problema, y lo resuelvo, o me mata o mato."

Eso en cuanto a antecedentes. Como testigos presenciales del hecho, presentó la defensa a Tiburcio Castro y a Miguel Delgado.

Declaró el primero: "Ví al Sr. Eloy Juncos que venía por el medio de la calle y al ver a Cosme Quintana viró y subió a la acera y siguieron hablando. Eloy Juncos le tiró con la mano izquierda una bofetada y acto seguido metió la mano atrás y sacó un aparato, no puedo precisar qué era lo que sacó." Y respondiendo a la pregunta "¿Y qué hizo Cosme Quintana?", contestó: "Yo no ví, sentí los dos tiros, no ví a él lo que hizo, sentí los dos tiros."

Y declaró Delgado; "Ví al Sr. Eloy Juncos que venía de la plaza . . . lo alcanzó a ver (a Quintana), dobló, y estaban

allí como hablando . . . Juncos le dió una bofetada y sacó como una cosa del bolsillo de atrás, y cuando fué a hacer así ocurrieron los dos disparos . . . Juncos cayó al suelo.''

Conocemos ya algo de la evidencia aportada por El Pueblo en relación con los antecedentes. Bastará agregar que doña Rosa Franquis declaró que poco antes de ocurrir el suceso, estuvo en su casa el acusado procurando a Eloy Juncos.

No presentó El Pueblo en verdad un solo testigo presencial, pero el propio acusado, momentos después del hecho, manifestó al jefe de policía que tuvo unas palabras con Juncos y le disparó, sin que hiciera referencia alguna a que Juncos lo agrediera.

Varias personas, entre ellos dos policías, oyeron los disparos. Arturo Meaux dijo: ''Sentí una detonación y me paré y miré hacia adelante, y ví dos hombres, entonces sentí otra detonación, avancé, ví correr al guardia Ayala y acercarse a los dos hombres y coger a uno que tenía un revólver en la mano, me acerqué al que estaba en el suelo, estaba boca abajo y lo viré boca arriba y meneaba una pierna y comprendí que estaba vivo. Yo solo no podía levantarlo y llamé y me ayudaron a conducirlo al hospital. Noté en el gabán del herido como una brasa de candela.''

Otro policía, Ortiz, que como Ayala oyó las detonaciones corrió al lugar del suceso. Buscó a ver si había armas y no las encontró. Sólo se ocupó el revólver que tenía en sus manos el acusado.

El Doctor Mujica que reconoció al interfecto encontró en su cuerpo una herida de bala con orificio de entrada por el sexto espacio intercostal interesando el pulmón izquierdo, la aorta descendente, la vena cava inferior, el estómago, el lado derecho del diafragma, encontrándose el proyectil en la base del pulmón derecho, y otra herida en el tercio inferior del brazo izquierdo. La muerte se debió a la hemorragia interna que produjo la primera herida cuyo orificio de entrada presentaba gran cantidad de pólvora y quemaduras en los

bordes de la piel en forma de tatuaje y debió causarse estando el arma casi pegada al cuerpo.

No estaba el jurado obligado a creer—y su veredicto indica que no creyó—a los testigos de la defensa que dijeron que al encontrarse los dos hombres, Juncos agredió a Quintana. Creyó la prueba del fiscal que tiende más bien a demostrar la comisión de un asesinato que la de un homicidio, pero en ausencia de testigos presenciales prefirió inclinar la balanza de su juicio en favor del acusado y lo declaró culpable de homicidio.

Nada sobre agresión indicó en los primeros momentos el propio acusado. Habló por sí misma la herida mortal, y el gabán que cubría el cuerpo de la víctima teniendo como una brasa de candela en los bordes de la perforación que con la herida mortal coincidía, humeaba, denunciando lo cerca que estuvo el brazo homicida. Todo fué rápido. Y ni sobre la persona caída, ni en los alrededores, se encontró arma alguna. No obstante el carácter pendenciero y el uso constante de armas de fuego que se atribuyen al interfecto y el estar dispuesto según el dicho de un testigo de la defensa a que lo mataran o a matar ese día, es lo cierto que en el momento crítico se encontraba desarmado. Y en cuanto a los móviles, no es posible dejar de tomar en consideración que en la lucha por la mano de Luz Virginia Franquis, Juncos triunfaba. La derrota se sentía en el campo de la oposición que ocupaba el acusado.

Bajo esas circunstancias no cabe concluir que el veredicto sea contrario a la prueba, ni tampoco que la corte al dictar su sentencia impusiera al acusado en el ejercicio de su discreción el máximo de la pena fijada por la ley.

En tal virtud, no habiéndose tampoco cometido por la corte de distrito los errores segundo y tercero que se le imputan, procede declarar sin lugar los recursos y confirmar la resolución y la sentencia apeladas.

El Juez Asociado Señor Wolf está conforme con el resultado.*

Los Jueces Asociados Señores Córdova Dávila y Travieso no intervinieron.