EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* RAMÓN RAMÍREZ FIGUEROA, acusado y apelante.

No. 3110.—*Visto:* Mayo 18, 1927. *Resuelto:* Julio 7, 1927.

1. DERECHO PENAL—APELACIÓN Y ERROR, Y CERTIORARI—REVISIÓN—VEREDICTOS Y CONCLUSIONES DEL JURADO—EN GENERAL.—Bajo las circunstancias del caso de autos *se resolvió* el veredicto y la sentencia no son contrarios a derecho y a las pruebas por ninguna de las razones señaladas por el apelante.

2. HOMICIDIO *(Homicide)*—EVIDENCIA—ADMISIBILIDAD EN GENERAL—CARÁCTER Y CONDUCTA DE LAS PARTES—DEL ACUSADO.—En ausencia de indicación alguna respecto al propósito del acusado al probar que sabía que el interfecto era peligroso, a menos que se tenga tal conocimiento, la prueba del carácter y conducta anterior del interfecto es inadmisible.

3. HOMICIDIO *(Homicide)*—APELACIÓN—REVOCACIÓN DE LA SENTENCIA APELADA.—En ausencia total de alguna objeción, protesta ó excepción, la admisión en

evidencia de una llamada declaración en inminente peligro de muerte *(dying declaration)*, el contenido de la cual es meramente cumulativo y en substancia una repetición de manifestaciones que ya están ante el jurado como parte del *res gestae,* no es, sin más, motivo suficiente para revocar.

Sentencia de *Charles E. Foote,* J. (Mayagüez), condenando al acusado por delito de homicidio voluntario, sin costas. *Confirmada.*

*P. Fajardo Martínez, Pedro Nelson Colberg* y *Pedro Baigés Gómez,* abogados del apelante; *José E. Figueras,* abogado de *El Pueblo,* apelado.

El Juez Asociado Señor Hutchison, emitió la opinión del tribunal.

[1] El apelante fué convicto del delito de homicidio voluntario, y alega que: el veredicto y la sentencia son contrarios a derecho y a la prueba aducida durante el juicio (*a*) porque la prueba presentada por el fiscal no era suficiente para justificar tal veredicto y sentencia, (*b*) porque no hubo prueba de que "la muerte fuera el resultado próximo y único" de la herida inferida por el apelante (asumiendo que así la hubiese inferido), (*c*) porque el jurado y la corte inferior pasaron por alto la prueba aducida por el acusado tendente a demostrar que la herida en cuestión fué casual y recibida en condiciones tales que no aparejaban responsabilidad criminal alguna por parte del acusado, y (*d*) porque no se probó que la muerte de Herminio Rosario, de haber sido ocasionada por el acusado, fuera causada ilegal y negligentemente.

El primer testigo del fiscal, Roque López, estaba en un cuarto que tenía una ventana o puerta que daba a un callejón estrecho que separaba las dos casas. El acusado ocupaba un cuarto al lado opuesto de este callejón, o que daba a un patio a que daba acceso el callejón. En el interrogatorio directo, Roque dijo que Hernández pasó por el callejón en dirección a la puerta del patio entre las dos casas; que el testigo oyó un disparo y que Rosario cayó en la puerta del cuarto ocupado por el testigo; que él no vió quien hizo el disparo ni el arma, pero que lo vió "a él" (al acusado) "y a su hermana" cuando vinieron en

auxilio del herido; y que el testigo no sintió disputa, lucha, pelea o reyerta.

En la repregunta este testigo manifiesta que sabía que el acusado estaba en su casa porque salió y dijo: "¿Qué hay, muchacho; qué te ha pasado? Eso no es nada"; que Rosario llegó cerca de las tres y media y permaneció allí por algún tiempo jugando con el acusado en el patio; que los dos estaban jugando como si estuvieran disputando; que Rosario estaba bromeando con el acusado; que Rosario estaba a la puerta de la habitación del acusado y fué donde Herminio y le dijo: "Tú no tiras nada," y el testigo le contestó: "Súbase para arriba, compadre, súbase para arriba, que un tiro se le sale a cualquiera que fuera," y él replicó: "Éste no tira nada: éste es un cobarde"; que ellos hacían que estaban disputando; que la distancia entre el acusado y el testigo era como de cinco metros; que Rosario había estado bebiendo y que siempre que bebía estaba de buen humor; que cuando se hizo el disparo Rosario cayó frente a la puerta de la habitación ocupada por el testigo; que Herminio no tenía nada en sus manos.

La declaración del médico que practicó la autopsia deja poco lugar a dudas de que la muerte sobrevino como resultado de las heridas.

El acusado fué inmediatamente al cuartel de la policía y dió cuenta de que había herido a Rosario, y entonces un policía se dirigió a la escena del suceso y la madre del acusado le entregó una escopeta y un cartucho vacío.

La declaración del médico arriba mencionado también indicó que las heridas producidas por el disparo en el cuerpo del interfecto estaban esparcidas por un área considerable, habiéndose presentado como prueba la camisa y la camiseta que Rosario usaba al tiempo del disparo.

Otro testigo, José Luciano, declaró, sin oposición u objeción por parte del acusado, respecto a una manifestación que se dice fué hecha por Rosario mientras era curado en el hospital, al efecto de que había visitado la casa de Juan

Ramírez, padre del acusado, y había hallado al acusado en su habitación como de costumbre, y que, siendo los dos amigos, había tocado al acusado, quien se sorprendió, y que Rosario se escondió en otra habitación; que el acusado suponía que había sido "Dominica" que estaba jugando con él y volvió a su cama diciéndole a Rosario que si volvía otra vez con esa "música" lo mataría, y así lo hizo.

La prueba de descargo tendió a demostrar que Rosario de jugando apuntaba con la escopeta hacia el acusado, quien trató de quitársela, y que el arma se disparó accidentalmente mientras luchaban por quitársela mutuamente. Pero otro médico que ocupó la silla testifical por la defensa, también declaró que las heridas cubrían un área de seis a siete pulgadas de diámetro. Este testigo igualmente manifiesta que no había señales de pólvora en la piel del interfecto, y al examinar la camisa y la camiseta en presencia del jurado, tampoco encontró indicio alguno de pólvora. Aunque no pretendió ser un perito y rehusó fijar las distancias con absoluta exactitud, este testigo confesó tener gran afición por la caza y una experiencia más o menos variada con escopetas así como con heridas causadas por disparos hechos con esa arma. El testigo está en la absoluta seguridad de que habrían señales de pólvora no solamente en la ropa sino también en la piel si se hubiera hecho el disparo a una distancia menor de tres pies, pero que un disparo de municiones hecho desde poca distancia no se esparcería, sino que haría un agujero en el blanco; y que las heridas que aparecían en el cuerpo del interfecto fueron recibidas a una distancia de tres a siete pies del cañón.

El jurado practicó una inspección ocular del lugar del suceso y tomó las medidas o distancias entre los distintos sitios mencionados por los testigos y a los cuales hacían referencia en sus declaraciones.

Bajo las circunstancias, no podemos estar de acuerdo con el apelante en que el veredicto y la sentencia son con-

trarios a derecho y a la prueba por ninguna de las razones señaladas según queda indicado.

[2, 3] No hay señalamiento de errores por separado, pero la segunda, tercera y cuarta proposiciones sometidas por el apelante a intervalos en el curso de la argumentación contenida en el alegato, son substancialmente que la corte inferior cometió error al admitir en evidencia la declaración en inminente peligro de muerte prestada por Herminio Rosario, al admitir determinada pregunta y contestación y al excluir prueba con respecto al carácter peligroso y pendenciero de Rosario.

Francisco Montalvo Colberg, Juez Municipal de Cabo Rojo, mencionó dos visitas en su declaración, así como dos conversaciones y dos manifestaciones hechas por Rosario, las cuales se tomaron por escrito en forma de declaración en inminente peligro de muerte varias horas después del disparo. La primera entrevista fué como a las siete y media de la noche, en presencia del médico que asistía al herido, y la segunda, como a las nueve de la noche en presencia del jefe de la policía y del secretario de la corte municipal.

Se ofreció en evidencia la segunda de estas dos manifestaciones, después de haberse tratado sin éxito de probar que había sido hecha como una declaración en inminente peligro de muerte, cuya admisión fué pronta y propiamente denegada por el juez sentenciador. El fiscal entonces trató de llevar ante el jurado la primera declaración, no como una declaración en inminente peligro de muerte, sino como parte del *res gestae*. Tampoco tuvo éxito en esto, y la cuestión llegó a ser, por lo menos temporalmente, un incidente terminado.

El siguiente testigo que ocupó la silla testifical fué el policía Remedio López, quien estaba por declarar, no respecto a ninguno de los extremos mencionados por el juez municipal, sino con respecto a una conversación que se decía haber tenido lugar cuatro o cinco minutos después del

disparo, cuando surgió el incidente en que se basa el apelante para su tercer motivo de error: sobre este punto los autos leen como sigue:

"¿Qué manifestación le hizo el Herminio Rosario a Ud? (Defensor) Me opongo a que el testigo conteste. (Juez) Cuatro o cinco minutos después, vamos a ver eso. (Defensor) Vamos a fundar nuestra oposición. El Tribunal Supremo de California, en su página 190 de la Enciclopedia Kerr's California Penal Code, ha resuelto lo siguiente: 'Evidence of police officer, to effect that after shot he ran to place where deceased was lying and had conversation with her for possibly half-minute or little longer, in which she declared that defendant was man who had shot her, is inadmissible, where such declaration is not made in defendant's presence, and no foundation is laid for it as dying declaration.' (Fiscal) Como dying declaration, pero no como parte de la *res gestae*. (Juez) Admitido, puede declarar el testigo."

Se volvió a hacer la pregunta, y la defensa expresó el deseo de saber si el testigo quería decir que la conversación había tenido lugar cuatro o cinco minutos después de haber llegado al hospital o cuatro o cinco minutos después del disparo. Entonces la corte intervino de propia iniciativa y dijo al fiscal que debía probar detalladamente, y si ello era necesario, por medio de otros testigos, todo lo que ocurrió o lo que se hizo durante el tiempo que había transcurrido entre el momento del disparo y el de la conversación de referencia, a fin de que, en vista de las circunstancias, la corte pudiera tener una idea más clara de la situación y pudiera hacer sus propias conclusiones.

Después de varias páginas de interrogatorio con respecto a los extremos indicados por el juez sentenciador, hallamos lo siguiente:

"(Fiscal) Con esa prueba preliminar nosotros introducimos como parte de la *res gestae* la declaración del testigo. (Juez) El testigo parte de que el acusado se presentó en el cuartel de la policía, el tiempo transcurrido entre el suceso y que el acusado se presentó al cuartel de la policía no ha sido determinado. (Fiscal) Vamos a dejar para determinar eso más tarde. (Juez) Presente todos los

testigos que tiene, las personas que condujeron al herido al hospital municipal, los que estaban allí antes de presentar al testigo Remedio López. (Fiscal) Voy a traer un solo testigo para ese fin porque me tropecé con la acusación que no tenía más testigos, yo he tenido que traer todo el resto de la prueba. (Defensor) Nosotros nos reservamos el derecho de repreguntar al testigo después que el fiscal termine con él. (Juez) Sobre la cuestión preliminar de si forma parte de la *res gestae* se puede preguntar ahora porque estamos en eso, en el preliminar. (*Defensor*) Entonces sobre lo preliminar nosotros podemos repreguntar. (Juez) Sí, puede repreguntar sobre eso.''

Después de diez o doce páginas de repregunta, se permitió que el testigo Remedio López abandonara la silla testifical mientras se examinaba a otros testigos extensamente respecto a las circunstancias que rodeaban el traslado del herido al hospital. Entonces, e inmediatamente antes de que Remedio López reanudara su declaración en el punto en que había sido interrumpido, surgió el incidente en que se basa el apelante para demostrar la admisibilidad de la declaración en inminente peligro de muerte hecha ante el Juez Municipal de Cabo Rojo.

Comenzó anunciando el fiscal que no tenía más prueba preliminar que ofrecer. A eso siguió una pregunta de la corte respecto a si había o no objeción a que se admitiera la declaración en inminente peligro de muerte hecha por el interfecto como parte del *res gestae*. Entonces la defensa argumentó extensa y detalladamente respecto a la suficiencia de lo que el fiscal había demostrado, y en forma tal que no deja lugar a dudas, bien en cuanto al hecho de que la admisibilidad de la declaración hecha por Rosario en presencia de Remedio López inmediatamente después de la llegada al hospital era la cuestión que se estaba considerando ni acerca del hecho ulterior y más significativo de que la defensa no estaba envuelta por el momento en ninguna confusión, mal entendimiento o impresión errónea a este respecto.

El segundo y tercer fundamento de la apelación a que

ya nos hemos referido se exponen en la siguiente forma en el alegato:

"Segundo error. La corte inferior erró al admitir en evidencia el 'Dying declaration' de Herminio Rosario, a la admisión del cual documento se opuso la defensa y tomó excepción, según comprueba el récord en los particulares siguientes:

"'El Fiscal termina su pruebe preliminar y ofrece en evidencia la declaración dada por el interfecto ante el Juez Municipal de Cabo Rojo. La Corte interroga al abogado del acusado si hay oposición y dicho letrado se expresa así: Nosotros nos vamos a oponer a que se admita esta declaración como *res gestae* por los motivos y fundamentos que consigna en el récord.

"'La Corte admite la evidencia y la defensa toma excepción.

"'La declaración es presentada en evidencia posteriormente.

"Tercer error. La corte inferior erró al admitir en evidencia la pregunta y respuesta que se transcriben a continuación:

"'Pregunta propuesta por el fiscal: ¿Qué manifestación le hizo el Herminio Rosario a Ud? Defensor: Me opongo a que el testigo conteste: vamos a fundar nuestra oposición, etc. Fiscal: Como 'dying declaration' pero como parte de la *res gestae*. Juez: Admitido, puede declarar el testigo.'"

El argumento de la defensa en la corte inferior respecto a la admisibilidad de la declaración del policía Remedio López sobre la manifestación hecha por Rosario a su llegada al hospital se toma *verbatim* de la transcripción taquigráfica y se incorpora en el alegato del apelante como que se refiere a la propuesta admisión en evidencia de la llamada declaración en inminente peligro de muerte hecha ante el juez municipal varias horas después de haber tenido lugar la entrevista con el policía.

Sería superfluo comentar tales tácticas.

La transcripción taquigráfica no contiene referencia alguna en relación con la llamada declaración en inminente peligro de muerte desde el momento en que fué ofrecida en dos ocasiones como prueba por el fiscal y excluída por dos veces por el juez de la corte inferior. Sin embargo, se ha unido el documento al final de ese récord, y el taquígrafo

hace mención a él como que fué admitido por la corte. Incidentalmente, diremos que el documento sigue a la resolución de la corte inferior en que se basa el apelante para sostener que excluyó la prueba de mala reputación de Rosario, aunque la corte, a juzgar por la transcripción, resolvió que esa prueba era admisible.

El apelante, al comentar la incongruencia evidente entre la manifestación imputada al juez sentenciador por la transcripción y el contexto, insiste en que la prueba en cuestión fué en realidad excluída, tal como lo demuestra la excepción anotada por el acusado en aquel entonces.

Es enteramente claro que el incidente que nos concierne envolvía la admisibilidad de prueba tendente a demostrar los antecedentes y la mala conducta de Rosario. El juez municipal había sido llamado a declarar por segunda vez como testigo de la defensa sobre este punto, y no existe la más remota indicación en parte alguna del interrogatorio de este testigo en ese momento que se relacione con la declaración en inminente peligro de muerte o respecto a declaración alguna hecha por Rosario. Por tanto, nos inclinamos a estar de acuerdo con el apelante en que el juez sentenciador probablemente dijo en su resolución de que se queja el apelante que la prueba que el acusado estaba tratando de presentar era "inadmisible," no que la misma u otra prueba que no fué ofrecida en ese momento era "admisible." Sin embargo, y aunque parece bastante curioso, inmediatamente después de la excepción tomada por la defensa a esta resolución la transcripción dice que "la prueba admitida por la corte, copiada literalmente, dice así:" Entonces sigue la llamada declaración en inminente peligro de muerte, la cual, según se dice en la posdata, fué firmada por el juez municipal, por el secretario de la corte municipal y por el jefe de distrito de la policía, como que fué hecha en presencia de estos funcionarios.

El juez sentenciador, en ausencia de objeción alguna o de observación de parte del abogado del apelante que no

tomó parte en el juicio, o del fiscal de distrito que intervino en el caso a nombre de El Pueblo, aprobó esta transcripción sin haber modificación o enmienda, según fué certificada por el taquígrafo y sometida por las partes.

Para los fines de esta opinión, por tanto, puede admitirse que la recrudescente declaración en inminente peligro de muerte fué admitida como prueba por la corte inferior, o por lo menos de algún modo misterioso, ese documento entró a formar parte del caso, bien durante el juicio o después del mismo. Lo cierto es que nunca se hizo objeción alguna a la admisión de tal prueba al momento de ser ofrecida, ni que el acusado tomó excepción a cualquier resolución dictada por la corte en este sentido.

La cuarta proposición en que se basa el apelante es algo más plausible. Pero no se demuestra que el error, si alguno hubo, perjudicara los derechos substanciales del acusado. Admitiendo para los fines de la argumentación, sin que lo resolvamos, que la mejor práctica hubiera sido permitir que el acusado probara los antecedentes y la mala conducta de Rosario, sin embargo, bajo las circunstancias de este caso en particular no estamos dispuestos a revocar la sentencia por ese único fundamento. Si, como alega el acusado, Rosario le estaba apuntando con una escopeta cargada, entonces el acusado estaba suficientemente justificado al tratar de quitarle el arma a Rosario y hubiese estado justificado al darle muerte, de ser necesario, con tal propósito. No se pretende alegar que Rosario estuviera buscando pelea o que tuviera la intención de acometer o inferirle daño corporal al acusado.

Por el contrario, toda la evidencia en este caso tiende concluyentemente a demostrar que Rosario estaba de muy buen humor, y que su disposición era retozona y amistosa. De suerte que parece razonablemente que la actitud del acusado no fué influída o provocada en ningún grado apreciable por el hecho, de ser un hecho, de que Rosario era una persona de carácter peligroso o pendenciero, aun cuando

el acusado tuviera conocimiento de sus antecedentes a este respecto, y en aquel entonces.

No hubo indicación alguna del propósito de parte del acusado de probar que sabía que Rosario era un hombre peligroso; y a menos que tuviera tal conocimiento, la prueba del carácter y la conducta anterior del interfecto era claramente impertinente. Y, en lo que se refiere a tal reputación y conducta, que, de ser conocidas por el acusado pueden ser consideradas como circunstancias atenuantes, el jurado parece haber dado al acusado el beneficio de cualquier duda sobre este punto al pedir clemencia para él, lo que parece haber recibido la consideración favorable por el juez sentenciador al imponer una pena de dos años y seis meses de presidio.

Lo que hemos dicho sería suficiente para resolver esta apelación tal como ha sido presentada por el alegato del apelante; pero el fiscal de esta corte recomienda la revocación de la sentencia por errores que señala y que surgen de lo siguiente:

"1. La admisión por parte de la corte inferior de ciertas manifestaciones hechas por el hoy interfecto, que fueron admitidas por la corte por el fundamento de que eran parte del *res gestae.*

"2. La admisión también por parte de la corte inferior de una declaración prestada por el interfecto ante el Juez Municipal de Cabo Rojo que se presentó como *dying declaration* y fué admitida por la corte."

Estamos muy de acuerdo con la corte inferior, con los abogados del acusado y con el fiscal de esta corte en que la llamada declaración en inminente peligro de muerte era inadmisible como tal y no hallamos nada en los autos que indique que fuera admitida.

El fiscal insiste en que este documento fué admitido como prueba "por entender la corte que era parte del *res gestae,* con la oposición de la defensa." Pero no se hace referencia a la página o parte de los autos en que la corte señale tal razón para admitir el documento en cuestión o

en que se haya formulado objeción alguna a su admisión por tales fundamentos por parte del acusado. Tampoco hallamos base satisfactoria para la conclusión a que ha llegado el fiscal.

La parte de los autos en que descansa el apelante en su segunda proposición no tiene nada que ver con la admisión de la prueba documental, según ya hemos demostrado. El método empleado por el abogado del apelante para darle un aspecto diferente a lo que en realidad ocurrió en la corte inferior sólo sirve para dar más énfasis al extremo últimamente mencionado.

El fiscal también asume que el documento en cuestión incluye la manifestación que se dice haber sido hecha por Rosario a las siete o a las siete y media de la noche. Pero tal como hemos indicado anteriormente, el juez municipal declaró que la primera de las dos manifestaciones hechas en su presencia lo fué también, en presencia del médico que asistía al interfecto; y la segunda, en presencia del jefe de la policía y del secretario de la corte municipal, quienes certifican el escrito que ahora tenemos bajo nuestra consideración.

Desde luego, es concebible que el documento pudo haber sido ofrecido por el fiscal como parte del *res gestae,* al terminar la prueba de descargo, y que la defensa se opusiera a pesar del silencio absoluto de los autos acerca de tal ofrecimiento u objeción. Pero se hace mención al escrito como la prueba admitida por la corte "inmediatamente después de," y evidentemente refiriéndose a, una resolución que acababa de dictarse y que fué objetada por la defensa, al efecto de que "la prueba es admisible." Y sería extraño que después de varias páginas de discusión respecto a la admisibilidad de cierta prueba introducida por el acusado para demostrar la mala reputación y los antecedentes del interfecto, el acusado tomara excepción de una resolución de que tal prueba era admisible. Sería aún más extraño si al final de tal discusión el juez sentenciador, sin resolver

la cuestión que estaba considerando, sin anunciar o indicar en la forma más remota su intención de dictar resolución sobre ninguna otra cuestión, dijera, con respecto a una declaración hecha en inminente peligro de muerte ofrecida como parte del *res gestae,* la cual fué excluída anteriormente durante el juicio, y sin que se renovara tal ofrecimiento: "la corte resuelve que la prueba es admisible."

Sería interesante saber si el juez sentenciador hizo algún comentario sobre esta alegada declaración en inminente peligro de muerte como parte del *res gestae* al instruir al jurado, pero no se han incluído en los autos ante nos las instrucciones dadas al terminar el juicio. Y, sea esto como fuere, la resolución de este caso no depende de la proposición de que se dejó de admitir el documento de referencia. Basta que se demuestre que el acusado no objetó la admisión del mismo en el momento en que fué admitido, o que tomó excepción de la resolución de la corte contra tal objeción, si no hubo objeción o resolución alguna en cuanto a este particular.

Por otra parte, si realmente jamás se admitió la llamada declaración en inminente peligro de muerte, la investigación y determinación de la manera y circunstancias en que llegó a incluirse el documento en la transcripción de la evidencia pueden dejarse a la sana discreción de la corte inferior y del Departamento de Justicia.

La declaración de Remedio López fué meramente acumulativa a la de José Luciano que había sido ya admitida sin objeción o protesta por parte del acusado. En realidad no era otra cosa que otra versión o paráfrasis de la misma manifestación hecha al mismo tiempo en presencia de ambos testigos y del médico que asistía al interfecto.

La declaración del médico tendió a demostrar que Rosario, debido a su estado de intoxicación y al efecto de la conmoción producida por la herida estaba imposibilitado de hacer una manifestación coherente e inteligible, y en realidad no hizo la manifestación en cuestión. Si Luciano y el

policía dijeron la verdad, entonces el médico debió haber estado equivocado, por lo menos en lo que se refiere a haberse hecho en realidad la manifestación.   La condición física y mental del paciente, en lo que afectaba su habilidad para relatar claramente lo ocurrido era cuestión relacionada con la fuerza probatoria de la declaración realmente prestada por él más bien que con su admisibilidad en evidencia.   Además, si Rosario, en menos de media hora después del disparo y como resultado de la conmoción ·e intoxicación estaba impedido de hacer una relación clara y razonablemente exacta de lo que en realidad había ocurrido, entonces parecería ser una presunción lógica que en igual o mayor grado le era imposible haber concebido o inventado una narración manifiestamente falsa aunque plausible.

De todos modos, la cuestión de si Rosario, dentro de las circunstancias que se desprenden de la investigación preliminar a que nos hemos referido, tuvo o no suficiente tiempo y oportunidad para reflexionar y formular una manifestación falsa, era principalmente una cuestión, en lo que concierne a la admisibilidad de la prueba, para ser determinada por el juez sentenciador.   Si Rosario hizo o no la manifestación imputádale, y si, de haber sido hecha, la manifestación era o no cierta, eran cuestiones de hecho para ser dilucidadas por el jurado.

En el caso de *El Pueblo* v. *Calventy,* 34 D.P.R. 390, citamos con aprobación de *Wigmore on Evidence* los siguientes párrafos: ·

"Este principio general se funda en la experiencia de que bajo ciertas circunstancias externas de conmoción física puede producirse una tensión de excitación nerviosa que paraliza las facultades reflejas y pierden su control, de modo que la manifestación que entonces tiene lugar responda de una manera espontánea y sincera a las sensaciones y percepciones reales ya producidas por la sacudida externa. Puesto que esta manifestación se hace bajo el dominio inmediato y sin control de los sentidos, y durante el breve período en que las consideraciones de interés propio no podían haberse traído enteramente a colación por la reflexión razonada, la manifestación puede

tomarse como especialmente digna de crédito (o, al menos, como que carece de los motivos generales de falta de confianza), y por tanto como que expresa la verdadera tendencia de la creencia del que habla en cuanto a los hechos que acaban de ser observados por él; y puede, por tanto, recibirse como testimonio de aquellos hechos. La situación ordinaria que presenta estas condiciones es una riña o accidente ferroviario. Pero el principio mismo es uno amplio.'' 3 Wigmore, sección 1747, p. 2250.

''Las manifestaciones deben haber tenido lugar *antes de que haya habido tiempo para idear y tergiversar*, por ejemplo, mientras la excitación nerviosa se supone que todavía domina y las facultades reflejas están aún en suspenso. Esta limitación es en la práctica la materia de la mayoría de las resoluciones.

''Debe observarse que las manifestaciones no *tienen que ser estrictamente contemporáneas* con la causa excitante; pueden ser subsiguientes a ella, siempre que no haya habido tiempo para que la influencia excitante pierda su influjo y sea disipada. La falacia, anteriormente tenida en cuenta por algunas cortes, de que la manifestación debe ser estrictamente contemporánea (*post.*, sec. 1756) debe su origen a la aplicación errónea de la doctrina del Acto Verbal: . . . .

''Además, no puede haber *ningún límite de tiempo definido y fijo*. Cada caso debe depender de sus propias circunstancias. . .

''Toda vez que la aplicación del principio depende, pues, enteramente de las circunstancias de cada caso, es por tanto imposible considerar las resoluciones sobre esta limitación como que tienen en rigor la fuerza de precedentes. El discutir de un caso a otro acerca de esta cuestión de 'tiempo para idear o tergiversar' es jugar con el principio y llenar los autos de sutilezas innecesarias e infructuosas. Hay una pérdida lamentable de tiempo por parte de las cortes supremas en tratar aquí bien de establecer o respetar precedentes. En vez de esforzarse débilmente por lo imposible deben decisivamente insistir en que todo caso sea tratado por sus propias circunstancias. Debieran, si pueden hacerlo, levantarse perceptiblemente aun a la mayor altura de dejar la aplicación del principio absolutamente a la determinación de la corte sentenciadora. Hasta que sea alcanzado ese resultado benéfico las lucubraciones de las cortes supremas sobre los detalles de cada caso continuarán multiplicando la lectura tediosa de la profesión.'' *Id.*, sec. 1750, págs. 2255–2256.

En este caso, como en el de *Calventy,* no necesitamos

llegar al extremo de adoptar sin condición o reserva alguna la indicación posterior del Profesor Wigmore de que la cuestión de admisibilidad debe dejarse en todos los casos enteramente a la discreción de la corte inferior. Pero no hallamos nada en el alegato del fiscal en el presente caso que justifique una desviación de la regla enunciada en el caso de *El Pueblo* v. *Calventy,* al efecto de que en ausencia de un claro abuso de discreción esta corte no intervendrá en la aplicación por el juez sentenciador del principio general envuelto, de acuerdo con las circunstancias que se desarrollaron durante el juicio. Ni tampoco encontramos que haya habido tal abuso de discreción en el presente caso.

*Debe confirmarse la sentencia apelada.*