SUCESIÓN DE FELICIANO MUÑOZ PÉREZ et al., demandantes y apelados, *v.* LEONARDO CEPEDA, demandado y apelante.

Núm. 10374.—*Sometido:* Mayo 3, 1951. *Resuelto:* Mayo 29, 1951.

---

*Gustavo Cruzado Silva,* abogado del apelante; *L. E. Dubón, R. García Cintrón, L. Ríos Algarín* y *J. Pieras, Jr.,* abogados de los apelados.

EL JUEZ ASOCIADO SEÑOR MARRERO emitió la opinión del tribunal.

Es un hecho incontrastable que Feliciano Muñoz Pérez falleció a consecuencia de una herida de bala recibida. También lo es que la bala que produjo esa herida fué disparada por el demandado Leonardo Cepeda. En reclamación de daños y perjuicios por la muerte de aquél, su sucesión radicó una demanda en el tribunal inferior. Luego de un juicio en los méritos, éste dictó sentencia declarando con lugar la demanda y condenando al demandado a pagar a los demandantes la suma de $10,000 en concepto de indemnización,(1) más las costas y $1,200 para honorarios de abogado.

Los catorce errores señalados por el demandado pueden reducirse a cuatro, a saber: que el tribunal inferior erró (1) al no admitir prueba sobre la mala reputación del interfecto;(2) (2) al apreciar la prueba y actuar movido por pa-

---

(1) Los $10,000 de la sentencia los distribuyó el tribunal inferior así: $4,500 para la menor Carmen Milagros Muñoz Padilla; $4,000 por partes iguales para los menores Félix y Luis Ángel Muñoz Torres por haber éstos recibido previamente la suma de $2,200 por concepto de seguro; y los $1,500 restantes para la demandante Carmen Padilla.

(2) Los errores 1, 2 y 10 son al efecto de que el tribunal inferior erró (primer error) al privar al demandado de establecer mediante prueba pertinente por él aportada que Feliciano Muñoz Pérez era persona agresiva por temperamento, de carácter díscolo, exaltado y dado a discusiones y controversias, tanto con sus propios familiares como con personas particulares, habiendo tenido disgustos y altercados que culminaron en serios contratiempos, que era persona dada a portar armas y que el día en que ocurrieron los hechos no solamente se encontraba en estado de embriaguez si que también portaba el arma con que le hizo el disparo al apelante, sin que tuviese licencia para portarla, a pesar de estar dichos hechos alegados en la segunda defensa especial de la contestación y sin que los mismos hubiesen sido eliminados previamente; (segundo error) al negar al demandado el derecho de establecer la mala reputación de Feliciano Muñoz Pérez y admitir prueba a tal efecto, a pesar de que mientras tal derecho le negaba al demandado permitió a la parte demandante presentar prueba sobre la buena reputación de él; y (décimo error) al negarse a admitir los testimonios de Antón Álvarez, Felícita Sánchez y Modesto Pedrogo, encaminados todos a demostrar la mala reputación y carácter díscolo y agresivo de Feliciano Muñoz Pérez, fundada en que dichos testimonios eran inmateriales, irrelevantes e impertinentes, a pesar de que tendían a probar lo alegado en la segunda defensa especial de la contestación.

sión, prejuicio y parcialidad; (³) (3) al ordenar que se eliminara la contestación dada por el policía Lino Rivera al manifestar éste que Andrea Rodríguez le había contestado que no sabía nada sobre los hechos, fundado el tribunal al ordenar la eliminación en que ese policía no había efectuado una entrada a ese efecto en el Libro de Novedades; (⁴) y (4) al no admitir como prueba el Libro de Novedades del Cuartel de la Policía. (⁵)

■■ Cuando en casos de esta naturaleza el demandado sostiene que dió muerte al interfecto en defensa propia, la reputación y actos específicos de violencia de éste son admisibles en evidencia, con el propósito de demostrar que se trataba de persona de carácter violento e impetuoso. *Pueblo* v. *Castro*, ante, pág. 96. No obstante, a fin de que esa prueba sea admisible se hace necesario demostrar que el

---

(³) Los errores 3, 4, 5, 6, 7, 11, 12, 13 y 14 imputan al tribunal sentenciador haber errado (tercer error) al declarar probado que mientras el causante de los demandantes, ya desarmado, corría desde una tienda situada en el lugar de los hechos hacia una fonda por allí también ubicada, el demandado le hizo un disparo con su revólver hiriéndole por la espalda; (cuarto error) al declarar probado, como lo hizo en sus conclusiones de hechos, que el demandado hirió al causante de los demandantes cuando éste huía indefenso y sin protección alguna; (quinto error) al declarar probado que el causante de los demandantes en ningún momento disparó al demandado ni apuntó con su revólver hacia éste, ni amenazó tampoco con hacerlo; (sexto error) al declarar probado que la muerte del causante de los demandantes fué causada por el acto ilegal del demandado, sin causa justificada; (séptimo error) al declarar que el testimonio de Andrea Rodríguez, niña de catorce años de edad, fué convincente y libre de toda sospecha, por cuanto esta testigo le manifestó al policía Lino Rivera que intervino en la investigación con motivo de lo ocurrido, al ser interrogada en el sitio de los hechos la misma tarde en que ocurrieron, que no había visto nada; (décimoprimer error) al no estimar y resolver que de acuerdo con la evidencia aducida dicho demandado actuó en legítima defensa propia al hacer el disparo que culminó en la muerte de Muñoz Pérez; (décimosegundo error) al apreciar en conjunto la prueba, por cuanto al hacerlo actuó movida por pasión, prejuicio y parcialidad, así como al dirimir el conflicto de la misma; (décimotercer error) al apreciar en conjunto la prueba de la que derivó erróneas conclusiones; y (décimocuarto error) al declarar con lugar la demanda descartando la prueba sobre legítima defensa propia.

(⁴) Éste es el octavo error señalado por el apelante.

(⁵) Éste figura como el noveno error en el señalamiento.

demandado tenía conocimiento pleno. de ese carácter violento e impetuoso de su oponente con anterioridad al momento en que se vió precisado a privarle de la vida. *Pueblo* v. *Varela,* 42 D.P.R. 823, 825; *Pueblo* v. *Quintana,* 50 D.P.R. 63, 72; *Pueblo* v. *Ramírez Figueroa,* 37 D.P.R. 87; *Pueblo* v. *Sutton,* 17 D.P.R. 345, 348; Wigmore *on Evidence,* Vol. I, Tercera edición, pág. 470, sección 63; Warren *on Homicide,* Vol. 2, Edición permanente, pág. 348, sección 204. Semejante prueba se admite para demostrar el estado mental del demandado al momento en que así actuó. Wigmore *on Evidence,* Vol. II, Tercera edición, pág. 44, sección 246. En el caso de autos la prueba ofrecida tendió a demostrar, de manera incontrovertible, que el demandado no tenía conocimiento de la supuesta mala reputación de su oponente. Bajo esas circunstancias no podemos convenir con el apelante en que fué un error del tribunal a quo no admitir prueba tendiente a probar esos extremos.

En casos como el presente es de importancia suma determinar si la causa próxima e inmediata de la muerte fué la culpa o negligencia del demandado. De haber actuado éste en defensa propia, debe exonerársele de toda responsabilidad. *Méndez* v. *Serracante,* 53 D.P.R. 849. Veamos, pues, qué prueba tuvo ante su consideración el tribunal sentenciador. Para discutir los errores relativos a la apreciación de ésta nos parece aconsejable hacer una síntesis de toda la evidencia que tuvo el tribunal ante sí, a fin de que sea esta misma la que hable y la que nos demuestre si su apreciación estuvo acertada o no.

La prueba de los demandantes consistió en las declaraciones de Carmelo Massari Olmeda, Jorge Valldejuli, Luz María Guzmán de García, Andrea Rodríguez, Ramón Nieves Alicea, Carmen Padilla, María Torres, Miguel Ángel Marrero y Dr. Ramón Llobet. Y la de los demandados en las del Dr. Antonio Ramos Oller, Pedro Andino Benítez, Rafael Molina, Rosario Loyola, Lino Rivera Arroyo, Justo Aníbal Lanzó, Jesús Figueroa, Otilio Flores, Antón Álvarez,

Modesto Pedrogo, Leonardo Cepeda Costoso y José Soto Morales. Veamos el testimonio de cada uno de éstos, eliminando las repeticiones en el testimonio de cada testigo y todo aquello que a los fines del caso que está ante nuestra consideración sea redundante.

*Carmelo Massari Olmeda* oyó dos detonaciones, pero antes de ello vió que llegaron dos automóviles, uno delante y otro detrás. En el del frente viajaba Cepeda. A la persona que viajaba en el otro la vió de espalda. Al detenerse los automóviles, Cepeda se bajó del suyo y vino hacia el otro carro, regresando después al suyo. Luego volvió al otro automóvil con un revólver en la mano; abrió la puerta de ese automóvil y haló por un brazo, para afuera, a Muñoz Pérez. Éste estaba sentado en el guía. Al halarlo, Cepeda le dijo unas palabras y le dió la espalda. Entonces Muñoz Pérez "haló por un revólver" y Pedro Andino dijo: Cepeda, lo matan." Cepeda se escondió y se cubrió detrás de un automóvil. Muñoz Pérez se pegó entonces a una acera inmediata y disparó un tiro al aire. Al hacer esto Muñoz Pérez, Juan "El Malote" lo agarró por detrás, lo metió en una tienda y allí forcejearon. Muñoz Pérez echó a correr hacia una fonda cercana. Cepeda salió detrás del carro y le disparó un tiro por la espalda. Cepeda seguía para encima del que había herido, con el revólver en la mano, pero Pedro Andino se metió por el medio para que no continuara tirando. Los dos disparos los oyó después que Muñoz Pérez se apeó del automóvil. Fué cosa de segundos entre el primero y el segundo disparos. Muñoz Pérez echó a correr cuando se vió desarmado y "entonces, por la espalda fué que el señor le hizo el disparo." Preguntado "¿Y usted le dijo al Juez, que Muñoz hizo ese disparo cuando Cepeda iba de espalda?" contestó "Sí, señor, de espalda iba . . . pero fué al aire." En el momento que corrió Muñoz hacia la fonda no llevaba revólver.

*Jorge Valldejuli* es contratista y Muñoz Pérez fué socio suyo. Aquél empezó a trabajar con el testigo en 1947 a

base de un sueldo de $65 semanales y el 25 por ciento de las utilidades. Como sueldo recibió hasta el día de su muerte $3,630 y como por ciento $4,899.30, o sea un total de $8,529.30.

*Luz María Guzmán de García* dice que como a las 9:00 ó 9:15 de la noche Cepeda pasó en su automóvil y detrás Feliciano Muñoz en el suyo. Al doblar la esquina, el automóvil de Cepeda se detuvo y detrás el de Muñoz. Cepeda se bajó de su carro y vino adonde estaba Feliciano en su automóvil y le dijo "que se bajara, que le iba a quemar el fondillo." Feliciano no se bajó y entonces Cepeda abrió la puerta del automóvil y bajó por un brazo a Feliciano a la calle. Feliciano se quedó parado en la calle con las manos dentro de los bolsillos. Cepeda fué a su automóvil, trajo un revólver, se escondió detrás del carro de Feliciano y éste se fué a una tienda que hay allí, se paró en una puerta e hizo un disparo al aire. Vió que la bala dió en el techo de la tienda. También, que Cepeda le disparó a éste. Estando Feliciano dentro de la tienda vino Juan "El Malote" y lo desarmó, le echó una llave y le quitó el revólver. Cuando Cepeda le disparó, Feliciano estaba desarmado, parado en la puerta de la tienda.

*Andrea Rodríguez* tiene catorce años de edad, está en séptimo grado y vive en la Calle Costoso. Como a las 8:45 de la noche iba para una tienda, oyó el freno de un automóvil y vió que Cepeda estaba delante en un automóvil color gris y que detrás había otro carro color negro. Vió que Cepeda se apeó de su carro, miró a la parte trasera de éste y regresó a su automóvil. Mientras tanto Muñoz Pérez tocaba la bocina y estaba dentro de su carro. Después de coger el revólver, Cepeda vino hacia el carro de Muñoz y le dijo con coraje a éste: "Apéate, si no quieres que te queme el fondillo." Muñoz se quedó en su automóvil, Cepeda abrió la puerta de éste y lo sacó por la camisa. En ese momento Cepeda tenía el revólver en la mano derecha. Muñoz anduvo entonces dos o tres pasos hacia atrás y sacó un revólver. A

Cepeda le gritaron "Cuidado, Cepeda" y éste "corrió para detrás del carro de Muñoz y Muñoz se dirigió a una tienda." Muñoz disparó un tiro al aire en la tienda y después de disparar al aire lo desarmaron, le quitaron el revólver. Juan Cruz "El Malote" forcejeó con Muñoz. Después que lo desarmaron éste se fué a correr a otra fonda que queda cerca de la tienda. No sabe si Cepeda veía cuando forcejeaban con Muñoz. Cuando Muñoz salió corriendo desarmado Cepeda le disparó desde detrás del carro. Preguntada "¿Corriendo de espalda a Cepeda?" contestó "Sí, señor. . . . Cuando fué a entrar a la fonda (Muñoz) estaba herido." Mientras estaban frente a frente, Cepeda tenía el revólver en las manos. Muñoz hizo el primer disparo, en la tienda, al aire.

*Ramón Nieves Alicea* conoció al interfecto durante varios años y "hasta donde yo lo conocí gozaba de buena reputación." Era hombre robusto, saludable, como de 30 a 40 años, y usaba licor socialmente.

*Carmen Padilla* es la viuda de Muñoz Pérez. Éste construía obras y ganaba muchísimo dinero. Es madre de Carmen Milagros, quien tiene un año siete meses. Aquél sólo usaba licor socialmente.

*María Torres* estuvo casada con Muñoz Pérez y se divorció de éste. Tiene dos hijos de él, llamados Ángel Luis y Félix Enrique, de 12 y 13 años respectivamente. Por concepto de una póliza de seguro recibió $2,200.

*Miguel Ángel Marrero* es contador en la firma de contratistas de Jorge Valldejuli. Corrobora a éste respecto a los ingresos de Muñoz Pérez.

*Dr. Ramón Llobet* es médico cirujano. Al día siguiente por la mañana lo llamaron del Hospital Municipal de la Capital. Allí estaba Muñoz Pérez recluído. "El historial que traía el paciente tenía herida de bala que le había entrado por un brazo y después había penetrado al tórax." Era una herida de bala al nivel del séptimo espacio intercostal, por el lado derecho del pecho, que le interesó el hígado. La bala

llevaba ·trayectoria "hacia adentro del pecho." La causa de la muerte fué el *shock* que le causó la herida de bala y la hemorragia interna. Murió como a los cinco días. Nunca estuvo en condiciones de operarse. La autopsia fué practicada por el Dr. Julio Dávila.

Hasta ahí la prueba de los demandantes. La del demandado fué la siguiente:

*Dr. Antonio Ramos Oller* es médico y a petición de Cepeda vió a Muñoz Pérez allá para el 30 de septiembre de 1948. Estaba herido, en un estado de *shock* y "se le notaba un olor a alcohol."

*Pedro Andino Benítez* vive en la Calle Costoso. De 9:00 a 9:15 de la noche leía un periódico frente al cafetín y fonda que tiene allí. Vió que venía un automóvil delante y otro detrás. Al coger la curva de la Calle Villarán el primero se paró y el segundo, que venía detrás tocando, chocó con la parte trasera del primero. Cepeda se apeó del carro, le abrió la puerta al carro del otro y éste salió. Tenían una discusión. Oyó cuando el otro le contestó "Váyase para allá, negro sucio." Entonces el testigo le dijo a Cepeda "Deja eso que ese señor está borracho." Caminaron como cuatro pasos. Vió que Muñoz Pérez sacó un revólver, y el testigo dijo entonces: "Mire, Nando, que lo matan." Vió que Muñoz Pérez hizo un disparo. En ese momento Cepeda no tenía ningún revólver en la mano. El declarante se metió para su establecimiento y sintió un disparo. Entonces vió a Muñoz y le dijo: "Métase para acá Feliciano que está herido." A la vez corrió para afuera y le dijo a Cepeda que Muñoz estaba herido y entonces Cepeda se fué al carro. Fué al teléfono y llamó al Cuartel de la Policía. Entonces llevaron al herido al hospital. Muñoz Pérez disparó en la dirección que estaba Cepeda. Conoce a Juan Cruz "El Malote", pero no sabe qué intervención tuvo éste en el asunto. A Muñoz Pérez lo hirió Cepeda. Después que Cepeda disparó fué que le vió el revólver a éste.

*Rafael Molina* es primer teniente de la Policía Insular.

La noche de los hechos vió a Muñoz Pérez en una camilla en el Hospital Municipal. Muñoz Pérez mandó a Loyola al c. . . . . . Habiéndose hecho objeción a lo que Muñoz Pérez le había dicho a Loyola, la corte declaró la misma con lugar y manifestó: "No voy a permitir a ningún policía que venga a declarar aquí una cosa de la cual no ha hecho apunte en el libro."

*Rosario Loyola* es Comandante del Puesto de la Policía Insular en San Juan y lo era el 30 de septiembre de 1948. Fué al Hospital Municipal a ver a Muñoz Pérez esa noche. Lo tenían en una camilla amarrado. No hizo entrada alguna en el Libro de Novedades porque no era el comandante del puesto. Muñoz Pérez estaba herido, postrado, forcejeando por soltarse de las ligaduras. Le preguntó quién lo había herido y Muñoz le contestó "Váyase al c . . ." La Corte ordenó la eliminación de esas palabras. Muñoz Pérez tendría como de 38 a 44 años, era hombre robusto, aparentemente sano y pesaría de 170 a 180 libras.

*Lino Rivera Arroyo* es policía y la noche en cuestión prestaba servicios en el Cuartel de la Parada 19. Vió a Feliciano con motivo de una llamada recibida. Se personó en el Hospital Municipal y observó que Muñoz estaba en estado de embriaguez, asumiendo una posición violenta. También se trasladó al sitio de los hechos y practicó una investigación. Interrogó a *Andrea Ramírez* la misma noche. Andrea es una muchachita que estaba con otra señora. Al decir que *Andrea Ramírez* le dijo "Que no sabía nada ella" la corte ordenó la eliminación de esas palabras y el demandado tomó excepción. Practicó en el Libro de Novedades el asiento que se le muestra y dice que de propio conocimiento no sabe nada. Objetada la admisión del libro por los demandantes, la corte declaró con lugar la objeción.

*Justo Aníbal Lanzó* entre 8:30 y 9:00 de la noche estaba parado en la esquina de las calles Costoso y Villarán. Vió venir dos automóviles. El que venía detrás chocaba con el que venía al frente. Se detuvieron. Cepeda se bajó de

su automóvil y vinc donde estaba Feliciano y le dijo: "Como que usted viene con ideas de romperme el carro. Yo a usted no lo conozco. . . . .si usted está borracho, no puede guiar; apéese, que le voy a buscar uno que le guíe." Cepeda empezó a llamar a alguien para que le guiara el carro.. Feliciano dijo "Está bien." Cuando Cepeda dió la espalda, Feliciano se metió la mano en el seno y sacó un revólver. Alguién gritó: "Cuidado, Cepeda, que te matan." ·Cepeda se escondió detrás del carro de Feliciano y éste "le mandó un tiro." Feliciano corrió y se metió en la tienda. Estaba en la puerta con el revólver señalando. "Entonces Cepeda corrió hacia alante y ahí fué que le mandó un tiro y lo cogió en la puerta y lo hirió." A Feliciano se le cayó el revólver de la mano después que le pegaron el tiro y Juan Cruz lo cogió del piso. Feliciano corrió a otra tienda y se metió·en casa de Pedro Andino y éste dijo "No tires más, que lo heriste y entonces Cepeda se fué." Entonces llevaron al herido al hospital.

Estando *Jesús Figueroa* frente al cafetín de Pedro Andino, vió que Muñoz Pérez se metía la mano en la cintura y sacaba un revólver. Oyó que Pedro Andino gritó "Cepeda, que te matan" y en esos·momentos Muñoz Pérez le disparó un tiro a Cepeda. Entonces Muñoz Pérez echó a correr para meterse en la tienda. Cepeda no le había pegado antes de eso. Cüando Cepeda le hizo el disparo, Muñoz tenía el revólver en la mano y buscaba a Cepeda. A Muñoz Pérez se le cayó el revólver al ser herido. No vió que nadie desarmara a Muñoz.

*Otilio Flores*·no sabe nada de lo ocurrido.

A *Antón Álvarez* se le inquiere sobre la reputación de Muñoz Pérez y al objetar los demandantes, la parte demandada informa que va a probar con el testigo que Felícita Sánchez fué víctima de un disparo de revólver que le hizo Muñoz Pérez.

*Modesto Pedrogo* fué llamado para declarar que Muñoz Pérez estuvo una noche en La Sierra Country Club, después

de estar éste cerrado y pidió violentamente que le abrieran. El tribunal sostuvo una objeción a ese interrogatorio.

*Leonardo Cepeda Costoso* es dueño de una lavandería, así como de un edificio en la Calle Costoso. El conserje de éste lo llamó pidiéndole que le llevara $60. Mientras se dirigía a la Calle Costoso un automóvil marca Kaiser le cruzó y cuando él se tiró por fuera el mismo carro "me tranca". Ese carro lo manajeba un señor que no conocía y "muerto está y no lo conozco." Entonces él dobló por la Calle Costoso y decidió bajarse del automóvil para ver quién le perseguía. Le preguntó al chófer del otro carro "Amigo, ¿qué le pasa conmigo . . . . que me viene persiguiendo?" Ese otro señor tenía la cabeza hacia abajo; estaba en estado de embriaguez. Cepeda le dijo: "No puede seguir guiando," y le pidió a los muchachos que estaban por allí que buscaran a alguien para que lo llevara a la casa. Entonces el hombre se apea y le dice: "Váyase al infierno, negro sucio, hijo de la gran puta, échate para afuera." Pedro Andino le dijo al testigo que no hiciera caso y cuando caminaban tres o cuatro pasos Andino le dijo: "Cepeda, tenga cuidado, que lo matan." Eso se debía a que Muñoz Pérez sacaba de su vaqueta un revólver calibre 32, Special Police. Entonces él (Cepeda) se escondió entre el bonete y la capota del carro de Muñoz Pérez y buscaba a éste, no para matarlo sino para defenderse. Entonces Muñoz disparó para donde el testigo estaba. Mientras Muñoz Pérez le acechaba, él le tiró al brazo y al recibir aquél el impacto de la bala se le cayó el revólver, el que recogió un muchacho llamado Juan, quien le dijo a Cepeda: "No le dispare más que ya está herido." Muerto está y no conoce a Feliciano. Le disparó porque éste le apuntaba y le persiguía con el mismo revólver que antes le había disparado. Entre uno y otro disparo no transcurrieron más de diez o quince segundos. No le tiró a matar sino al brazo. A pesar de que Muñoz Pérez le chocaba su automóvil por detrás, él no se mortificó, ni se violentó y lo trató de amigo cuando se apeó. Cuando Muñoz le dijo las pala-

brotas ya copiadas, Cepeda no le dijo nada porque aquél apestaba a ron. Después de disparar fué al Cuartel de la Policía y entregó su revólver.

*José Soto Morales* llegó en el preciso momento en que estaba terminando el incidente y no vió nada.

Con esa prueba ante su consideración el tribunal inferior en el curso de su opinión hizo las siguientes conclusiones de hechos:

1. Que Feliciano Muñoz Pérez falleció el día 5 de octubre de 1948, sucediéndole como sus únicos y universales herederos sus hijos legítimos y su viuda, aquí demandantes.

2. Que el interfecto en la fecha de su fallecimiento estaba en la plenitud de su vida, tenía 35 años de edad y era hombre fuerte y saludable, dependiendo de él todos los demandantes para su alimentación y sustento.

3. Que para la fecha de su fallecimiento Muñoz Pérez trabajaba como contratista de obras asociado al ingeniero Jorge Valldejuli, percibía un semanal fijo de $65 y un 25 por ciento de las utilidades, lo que ascendía a $8,000 anuales aproximadamente.

4. Que el 30 de septiembre de 1948, entre 8:00 y 9:00 de la noche el demandado Cepeda conducía un automóvil por las calles de Santurce, habiéndolo detenido en un sitio próximo a la esquina que forman las calles Costoso y Villarán, deteniéndose también en ese mismo momento, detrás del automóvil de Cepeda otro automóvil guiado allí y entonces por Muñoz Pérez.

5. Que el demandado Cepeda se apeó de su automóvil y después de examinar la parte trasera del mismo, volvió hacia su automóvil del cual extrajo un revólver, dirigiéndose entonces hacia el automóvil de Feliciano Muñoz Pérez, quien aún permanecía sentado dentro del mismo, frente al guía, tocando bocina.

6. Que al llegar Cepeda junto al automóvil que guiaba Muñoz Pérez, aquél se detuvo al lado izquierdo del mismo, frente al sitio donde se encontraba sentado Muñoz Pérez y dirigiéndose a éste en forma violenta le dijo: "Apéate, si no quieres que te queme el fondillo."

7. Que Muñoz Pérez nada respondió, permaneciendo dentro de su automóvil de donde fué sacado en forma violenta por

el demandado cuando éste abrió la portezuela del automóvil halándolo por la camisa hacia la calle.

8. Que mientras sacaba en forma violenta de su automóvil a Muñoz Pérez, Cepeda portaba un revólver en su mano derecha.

9. Que Muñoz Pérez al ser sacado de su automóvil por el demandado, caminó dos o tres pasos hacia atrás sacando entonces un revólver y dirigiéndose hacia una tienda próxima situada a unos 25 ó 30 pies de distancia hizo un disparo al aire con su revólver.

10. Que cuando Muñoz Pérez sacó su revólver alguien gritó: "Cuidado, Cepeda", corriendo entonces Cepeda hacia el automóvil de Muñoz Pérez, donde se parapetó detrás del mismo.

11. Que después que Muñoz Pérez hizo en la tienda el disparo al aire antes referido, fué inmediatamente desarmado por Juan Cruz alias "El Malote." (⁶)

12. Que después de desarmado, Muñoz Pérez salió de la tienda corriendo hacia una fonda próxima.

13. Que mientras Muñoz Pérez, ya desarmado, corría desde la tienda hacia la fonda, el demandado le hizo un disparo con su revólver *hiriéndolo por la espalda*.

14. Que Muñoz Pérez falleció como consecuencia del referido disparo de revólver hecho por el demandado, disparo que le infirió una herida de bala que le atravesó el pulmón derecho y el hígado ocasionándole la muerte.

15. Que el demandado hirió al causante de los demandantes cuando éste huía indefenso y sin protección alguna.

16. Que cuando el demandado *hirió por la espalda* a Muñoz Pérez, dicho demandado no actuó en defensa propia, no estaba entonces en peligro de perder su vida o de sufrir daño corporal alguno, ni tenía razón para creer que su vida corría peligro o que su persona estaba expuesta a sufrir daño corporal.

17. Que Muñoz Pérez en ningún momento disparó al demandado, ni apuntó con su revólver hacia éste ni amenazó tampoco con hacerlo.

18. Y que la muerte de Muñoz Pérez fué causada por el acto ilegal del demandado y sin causa justificada.

El tribunal inferior hace constar inmediatamente que la prueba fué contradictoria, pero que "teniendo en cuenta el

---

(⁶) Aunque varios testigos se refirieron en sus declaraciones a Juan Cruz, alias "El Malote", éste, como se ha visto, no fué llamado a declarar por ninguna de las partes.

crédito que cada uno de los testigos le ha merecido, es de parecer que los hechos ocurrieron en la forma y manera en que declararon los testigos por la parte demandante"; que entre los testigos de ésta quería "hacer mención específica del testimonio de la testigo Andrea Rodríguez, niña de catorce años de edad, estudiante de sétimo grado, cuya declaración fué convincente en todos sus extremos y libre de toda sospecha" y que "por el contrario, los testigos del demandado, por la observación que hizo el tribunal de los mismos y por su forma de declarar, no le merecieron crédito alguno."

Hemos leído reiterada, fría y serenamente y con el mayor detenimiento la totalidad de la transcripción elevada. Todas y cada una de las conclusiones de hechos del tribunal inferior, a nuestro juicio, están sostenidas por la prueba. La única excepción consiste en que en sus conclusiones 13 y 16, supra, el tribunal inferior hace constar que Cepeda hirió a Muñoz Pérez por la espalda. Aunque varios testigos de los demandantes declararon a ese efecto, el testimonio del Dr. Llobet, testigo también de esa parte, demuestra lo contrario. La propia apelada al discutir el tercer error señalado está de acuerdo en que fué un error del tribunal a quo hacer semejante aseveración en sus conclusiones.(7) Ello, sin embargo, no varía la situación. Si conforme concluyó el tribunal sentenciador el demandado al disparar a Muñoz Pérez no lo hizo en defensa propia, a los fines del caso que está ante nuestra consideración lo mismo da que la herida recibida por el interfecto lo fuera por la espalda o, como dijo el Dr. Llobet, por un brazo y luego penetrara en el tórax. La apelación se da contra la sentencia y no contra los fundamentos de la opinión. *Bird* v. *Bird*, 69 D.P.R. 369; *Latorre* v. *Cruz*, 67 D.P.R. 743.

Ha sido doctrina consuetudinaria e inveterada de esta Corte Suprema respetar las conclusiones de hechos de un tribunal inferior, a no ser que al apreciar la prueba éste haya

---

(7) Véase la página 10 del alegato de los apelados.

cometido manifiesto error o actuado movido por pasión, prejuicio o parcialidad. *Figueroa* v. *Picó*, 69 D.P.R. 401; *Bird* v. *Bird*, supra; *Rivera* v. *Casiano*, 68 D.P.R. 190; *Robles* v. *Guzmán*, 67 D.P.R. 718, 721. No puede decirse en este caso que la aquilatación de la prueba hecha por el tribunal a quo sea manifiestamente errónea. Tampoco hallamos base en los autos para sostener que el juez sentenciador en el curso del juicio actuara movido por pasión, prejuicio o parcialidad.

◾ Respecto al octavo error señalado, (⁸) bastará decir que aun aceptando a los fines de la argumentación que el tribunal inferior errara al eliminar del récord la manifestación del policía Lino Rivera al efecto de que Andrea Rodríguez le había dicho que no sabía nada sobre el caso, fundándose para ello el tribunal en que dicho policía no hizo en el Libro de Novedades un asiento a ese efecto, tal error no es uno que deba dar lugar a la revocación. En primer lugar el policía Rivera no se refirió en forma alguna a Andrea Rodríguez, sino a Andrea Ramírez. Es posible que Andrea Ramírez fuera otra persona. Y en segundo lugar, aún si el propósito hubiera sido impugnar el testimono de Andrea Rodríguez, tal impugnación iba más bien dirigida al crédito que debía merecerle al tribunal esa testigo, pero aún si elimináramos en su totalidad el testimonio de ella nos encontraríamos con que en los autos habría siempre suficiente prueba, creída por el tribunal inferior, para sostener las conclusiones a que llegó.

◾ Conforme dijimos en *Caraballo* v. *P. R. Ilustrado, Inc.*, 70 D.P.R. 283, 290 "El Libro de Novedades de la Policía no goza de un *status* legal claro y definido y el mismo, en opinión de los versados en la materia, como récord público constituye un enigma." Aquí dicho libro se ofreció en evidencia para demostrar que el policía Rivera Arroyo había hecho constar en el mismo que al practicar la investigación Andrea

---

(⁸) Véase la nota 4 al calce.

Rodríguez le informó que no sabía nada del caso. Aceptando, sin resolverlo, que fuera un error del tribunal sentenciador no admitirlo como prueba, podemos repetir sobre el particular lo dicho más arriba al efecto de que aún, si elimináramos totalmente el testimonio de esa testigo, siempre habría en los autos suficiente prueba, creída por el tribunal, para sostener las conclusiones a que llegó.

Por otra parte, tampoco cometió la corte inferior un error que da lugar a la revocación al no admitir en evidencia lo declarado por los testigos Rafael Molina y Rosario Loyola respecto a lo que el interfecto les había dicho mientras estaba herido en el hospital. Se recordará que el fundamento que tuvo la corte para no admitir ese testimonio fué que ellos no habían llevado al Libro de Novedades las manifestaciones héchasles por Muñoz Pérez. Aunque fué un error no admitir esas manifestaciones por el fundamento indicado, como las mismas tendían a probar el carácter violento del occiso y toda vez que Cepeda no tenía conocimiento de tal carácter, prueba a ese efecto resultaba inadmisible.

*Debe confirmarse la sentencia apelada.*